STANDARD OIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

SUN OIL COMPANY OF PENNSYLVANIA, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Defendants.

MOBIL OIL CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Defendants.

TEXACO, INC., Plaintiff,

v.

John F. O'LEARY, Administrator and Federal Energy Administration, Defendants.

GULF OIL CO., Plaintiff,

v.

John F. O'LEARY, Administrator and Federal Energy Administration, Defendants.

SHELL OIL CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

AMOCO OIL CO., Plaintiff,

v.

John F. O'LEARY, Administrator, Federal Energy Administration, Defendants.

ATLANTIC RICHFIELD CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

EXXON CORPORATION, Plaintiff,

v.

John F. O'LEARY, Administrator of the Federal Energy Administration and Federal Energy Administration, Defendants.

Nos. C76–1279, C76–1288, C76–1344, C77–11, C77–82, C77–92, C77–168, C77–187 and C77–406.

United States District Court, N. D. Ohio, E. D.

Jan. 20, 1978.

See also 440 F.Supp. 329.

Charles F. Clarke, David A. Nelson, Geoffrey K. Barnes, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff in No. C76–1279.

Alan S. Novins, Lobel, Novins & Lamont, Washington, D. C., on brief, for amicus curiae in all cases.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., for defendants in Nos. C76–1279, C77–82, C77–92, C77–168, C77–187 and C77–406.

James W. Garvin, Jr., Dennis G. Linder, U. S. Dept. of Justice, Washington, D. C., for defendants in No. C76–1279.

Andrew J. Kilcarr, Washington, D. C., Thomas R. Trowbridge, III, Donovan Leisure Newton & Irvine, New York City, Arthur F. Zalud, Thompson, Hine & Flory, Cleveland, Ohio, for plaintiff in No. C76–1344.

Irving Jaffe, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendants in No. C76–1344.

William H. Allen, James Baller, Robert D. Daniel, Covington & Burling, Washington, D. C., Wm. Smith, Calfee, Halter & Griswold, Cleveland, Ohio, Edward J. Ciechon, C. Steven LeBaron, Sun Oil Company, Philadelphia, Pa., for plaintiff in No. C76–1288.

Stanley D. Rose, Dept. of Justice, Washington, D. C., for defendants in C76–1288, C77–82, C77–92 and C77–168.

Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, for defendants in No. C76–1288, C76–1344 and C77–168.

Smith Warder, Arter & Hadden, Richard A. Dean, Cleveland, Ohio, William R. Slye, New York City, for plaintiff in No. C77–11.

John M. Cronquist, Wentworth J. Marshall, Jr., Cronquist, Smith & Marshall, Cleveland, Ohio, Catherine C. McCulley, Houston, Tex., for plaintiff in No. C77–82.

D. D. Weisberger, Asst. U. S. Atty., Cleveland, Ohio, for defendants in Nos. C76–1288, C76–1344, C77–82, C77–92, C77–187 and C77–406.

C. Max Vassanelli, Dept. of Justice, Washington, D. C., for defendants in Nos. C76–1279, C76–1288, C77–82, C77–92, C77–168 and C77–406.

Wm. Simon, Wm. E. Wickens, Richard A. Kleine, Howrey & Simon, Washington, D. C., Baker, Hostetler & Patterson, Wayne C. Dabb, Jr., Richard F. Stevens, Cleveland, Ohio, for plaintiff in No. C77–92.

Louis Paisley, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for plaintiff in No. C77–168.

Sterling Newell, Jr., Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, Joseph A. Ball, Ball, Hunt, Hart, Brown & Baerwitz, Long Beach, Cal., Richard C. Morse, Atlantic Richfield Co., Legal Div., Los Angeles, Cal., for plaintiff in No. C77–187.

Donald B. Craven, A. Theodore Giattina, Miller & Chevalier, Washington, D. C., Michael R. Gallagher, Alan M. Petrov, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, Dillard W. Baker, Barbara Finney, Exxon Company, U. S. A., Houston, Tex., for plaintiff in No. C77–406.

Gerald D. Freed, Dept. of Justice, Washington, D. C., for defendants in No. C77–406.

## MEMORANDUM OF OPINION

MANOS, District Judge.

### I.

### PROCEDURAL HISTORY

On July 21, 1977, this court issued an order denying the defendants' motions to dismiss the actions filed by each of the petroleum refiner plaintiffs. That earlier decision, which is reported, contains a detailed discussion of the procedural history

---

1. *See Standard Oil I,* 440 F.Supp. at 365 (N.D. Ohio, 1977).

2. *See Standard Oil I,* 440 F.Supp. at 365, fn. 93 (N.D.Ohio, 1977).

---

of each of the nine cases up to July 21, 1977. *See Standard Oil Company, et al. v. F. E. A.,* 440 F.Supp. 329, 331 (N.D.Ohio, 1977) [hereinafter cited as *"Standard Oil I"*]. The court shall not repeat the procedural history delineated in its previous Memorandum of Opinion.

In *Standard Oil I* this court concluded that it sustained jurisdiction to determine three purely legal questions common to the complaints filed by all nine refiner plaintiffs. Those issues were:

(1) "Whether the FEA's interpretation of the semantic meaning of the regulations governing refiner passthroughs of increased costs during the period January 1, 1975 through January 31, 1976, is correct." [1]

(2) "Assuming, *arguendo,* that the FEA's current interpretation of the semantic meaning of the applicable regulations is correct, are those regulations *inconsistent with the procedural . . . statutes* pursuant to which the regulations were promulgated?" (emphasis added).[2]

(3) "Assuming, *arguendo,* that the F.E. A.'s current interpretation of the semantic meaning of the applicable regulations is correct, are those regulations *inconsistent with the . . . substantive statutes* pursuant to which the regulations were promulgated?" (emphasis added)[3]

On July 27, 1977 the court ordained a schedule for filing cross-motions for summary judgment on the merits of the three above-delineated *legal* issues, along with a schedule for filing documentary materials, and argumentative memoranda. The parties complied with that schedule, and today the court rules on their respective summary judgment motions.

---

3. *See Standard Oil I,* 440 F.Supp. at 365, fn. 93 (N.D.Ohio, 1977). For an explanation of the "Statutory and Regulatory Background" which crystalized the three issues enumerated in the text, *see* Part I of this court's previous opinion in *Standard Oil I,* 440 F.Supp., at 332.

## II.

### FACTS PERTAINING TO THE MERITS OF THE REFINER–PLAINTIFFS' COMPLAINTS [4]

A. *THE EVOLUTION OF PETROLEUM REFINER PRICE REGULATIONS UNDER THE COST OF LIVING COUNCIL*

The FEA's regulations evolved from rules originally promulgated by the Cost of Living Council ("CLC") under President Nixon's Economic Stabilization Program.

The program began with Executive Order 11615, 36 Fed.Reg. 15727 (August 17, 1971), which froze prices and wages at levels existing during the 30-day period ending August 14, 1971. During the next 18 months the federal government endeavored to stop inflation with mandatory price controls, applied to the nation's economy. In January 1973 the government instituted "Phase III," which attacked inflation through a system of self-administered voluntary restraints, and federally promulgated wage and price guidelines which were designed to compress inflation to an annual rate of two and one-half percent.[5]

At this time domestic crude oil production was declining, and the nation was becoming increasingly dependent on foreign crude. Foreign producers were raising their prices, and prices for home heating oil and other refined petroleum products were on the rise. On March 6, 1973, the CLC issued "Special Rule No. 1," reintroducing mandatory price controls for refiners that had annual sales of $250 million or more.[6] Special Rule No. 1 imposed a profit margin limitation and established a pre-notification procedure for companies that sought to increase prices more than one and one-half

percent above their base prices. Base prices were defined as prices in effect during a specified historical base period.

On June 13, 1973, President Nixon issued an executive order imposing a new 60-day freeze on the prices of most commodities and services.[7]

In July of 1973 the CLC published proposed rules for "Phase IV" price controls to become effective at the end of the 60-day freeze. Special rules—to be included in Subpart L of the regulations—were proposed for the petroleum industry.[8] Under the proposed rules, maximum lawful prices for refined petroleum products would consist of three elements:

1. May 15, 1973 price to a class of customer (base price);
2. Increased costs of domestic crude oil and imports, subject to a profit margin limitation;
3. Other allowable costs, subject to pre-notification and a profit margin limitation.[9]

"Base price" was defined as:

".  .  . the price the manufacturer charged for that product (reflecting any applicable customary price differential) on May 15, 1973." [10]

The Phase IV proposal retained the base price concept inherent in earlier Special Rule No. 1—*i. e.,* the use of base price fixed as of an historical point in time. Increased costs incurred subsequent to the base period could be added, under the proposal, to the base price to determine the maximum lawful price. Unlike Special Rule No. 1, the proposed Phase IV regulations would have permitted the recovery of increased costs of imports and domestic crude oil, *i. e.,* product costs, without pre-notification. "Other allowable costs" would have continued to be

---

4. In order to fully appreciate the factual background of this case the reader should examine Part I of this court's prior decision in *Standard Oil I.* (For citation, *see* fn. 3, *supra.*)

5. *See* Executive Order 11695, 38 Fed.Reg. 1413 (November 12, 1973).

6. *See* 38 Fed.Reg. 6283 (March 8, 1973).

7. *See* Executive Order 11723, 38 Fed.Reg. 15765 (June 15, 1973).

8. *See* 38 Fed.Reg. 19464 *et seq* (July 20, 1973).

9. *See* proposed §§ 150.356 and 150.359(a), published at 38 Fed.Reg. 19482–19483 (July 20, 1973).

10. *See* ¶ 150.359(a) and fn. 9, *supra.*

subject to the pre-notification requirement, and all increased costs would have been subject to the profit margin limitation.

The CLC furnished no explicit notice that its proposed regulations required the various cost elements to be recovered in any particular order when selling prices were less than the lawful maximum. On its face, the proposal appears to have focused solely on the establishment of *a maximum price* which could not lawfully be exceeded.

On August 10, 1973 the CLC extended the price freeze for petroleum and petroleum products for one week, with the explanation that the CLC needed a week to consider the comments received on the proposed Subpart L regulations, review the methods by which the CLC's policy decisions would be implemented, and write the regulations in final form.[11] When Dr. John T. Dunlop, Chairman of the CLC, announced this one week extension he stressed that:

> "The Council has been very concerned that the final regulations strike a delicate balance between constraining prices while at the same time encouraging the necessary increase in supplies which the country must have. The Council is aware that energy prices must be allowed to rise in order to stimulate development of new energy reserves and make possible the purchase of higher cost foreign oil. At the same time we must prevent unnecessary price increases."[12]

The Council received 272 written comments on Subpart L, and "each comment . . . was reviewed by the attorneys and economic analysts responsible for the subpart." In addition, the CLC staff "conducted numerous meetings with affected parties and made an intensive re-examination of the regulations. . . ."[13]

The final Phase IV petroleum price regulations were issued on August 17, 1973.[14] That regulatory framework, on its face, appeared to focus solely on the establishment of a maximum lawful price. The price was comprised of the same cost elements previously identified in the notice of proposed rulemaking. However, the definition of base price was expanded to include the cost of imports and domestic crude oil. This change effectively removed the profit margin limitation from recovery of all costs associated with the procurement of raw petroleum products, *i. e., "product costs."*

The original Subpart L proposal would have waived the pre-notification requirement for price adjustments reflecting certain increases in the cost of crude petroleum and imported petroleum products.[15] In the final version of Subpart L, this concept was translated into a re-definition of the base price "to cover both the historical price, plus increased costs in the raw material."[16] Nothing in the regulations published in the Fall of 1973 affirmatively suggests that the expansion of the definition of "base price," to include product costs, was crafted to embrace an unarticulated sequence of recovery rule.[17]

In September of 1973 the CLC amended its Phase IV petroleum regulations to spell out the refiners' right to "bank" product cost increases for recovery in the future.[18] This amendment also made it clear that in calculating base prices, refiners were not required to include the full amount of their increased product costs; they could exclude from base prices such portion of their product cost increases as they chose to bank. The amendment pertinently provided:

11. *See* 38 Fed.Reg. 21933, 21934 (August 14, 1973).

12. *See* plaintiffs' Exhibit 2, p. 1, filed on September 14, 1977, in support of the plaintiffs' motion for summary judgment.

13. *See* 38 Fed.Reg. 22536 (August 22, 1973).

14. *See* 38 Fed.Reg. 22536 (August 22, 1973).

15. *See* proposed § 150.356(b), 38 Fed.Reg. 19482 (July 20, 1973).

16. *See* 6 C.F.R. § 150.358(g), 38 Fed.Reg. 22541 (August 22, 1973).

17. *Compare,* 38 Fed.Reg. 22536 *et seq.* (August 22, 1973).

18. *See* 6 C.F.R. § 150.356(c), 38 Fed.Reg. 24687–25688 (September 14, 1973).

"*If,* in any month beginning with September 1973, a firm establishes a base price for any covered product . . . *which does not include the entire amount of increased [product] costs* . . ., the unused portion may be added to the May 15, 1973, selling price to compute the respective base price for a subsequent month." (emphasis supplied)

The flexibility afforded refiners in determining the quantity of increased product costs that could be included in the base price was a prominent feature of the Phase IV regulations. A similar feature permitted refiners discretion to allocate increased product costs among various product categories.

The Phase IV regulations singled out gasoline, No. 2 heating oil and No. 2 diesel fuel for special treatment in this regard.[19] In computing base prices with respect to each of these "special products," a refiner could include no more than that particular product's proportionate share (by volume) of increased crude oil costs. With respect to other covered products, however, the refiner could use as much of its increased crude oil costs as it desired, including costs allocable to gasoline, No. 2 heating oil and No. 2 diesel fuel. Should the refiner so elect, it could use *all* its increased crude oil costs in computing base prices for "other covered products."[20] The regulations thus created a *flexible base* price that permitted a refiner to recover a disproportionate amount of its increased crude oil costs on sales of other covered products or to bank such costs for recovery at a later date.

The Phase IV regulations also afforded refiners flexibility with respect to the allocation of non-product cost increases. By a notice of proposed rulemaking published in October of 1973, the CLC proposed adoption of a formula designed to provide for the allocation of non-product cost increases in a manner similar to that used in allocating increased product costs.[21] The proposed formula was simplified in a notice of proposed rulemaking published in November, 38 Fed.Reg. 31686 (November 16, 1973), and this simplified version was adopted without change.[22]

The non-product cost formula provided a means whereby a pre-notified non-product cost increase expressed in percentage form could be translated into a total dollar amount reflecting projected sales for a 12-month period.[23] The regulations provided that all increased non-product costs could be allocated to covered products other than special products, at the refiner's option, and the total pool of non-product cost increases so allocated was available for recovery over a 12-month period.[24]

B.  *THE EVOLUTION OF REFINER PRICE RULES UNDER THE FEDERAL ENERGY OFFICE*

In 1973 Congress passed the Emergency Petroleum Allocation Act. Pub.L. 93–159, 87 Stat. 628 (November 27, 1973), 15 U.S.C. §§ 751 *et seq.* [hereinafter "EPAA"]. The EPAA conferred petroleum product price control authority on the President of the United States who was to exercise that

**19.**  This was apparently done because gasoline, fuel oil, and diesel fuel were uniquely "sensitive" products. During his deposition David Goss Wilson, who was Associate General Counsel for the Cost of Living Council in 1973 (Wilson's Dep. 9–10), and Deputy General Counsel of the FEO and FEA in 1974 through 1977 (Wilson's Dep. 31) was examined regarding the three special products recognized in the Phase IV regulations.

"Q.  What was the basis or purpose of that distinction, if you know?
"A.  The distinction was essentially that those products were considered the most important products and the most sensitive and therefore, required special treatment with re-spect to receiving proportional allocation of costs of increased costs that could be attributed to them, and reflected in prices charged for those products." (Wilson Dep. 35).

**20.**  *See* 6 C.F.R. §§ 150.356, 150.357, 38 Fed. Reg. 22540–22541 (August 22, 1973).

**21.**  *See* 38 Fed.Reg. 28845 (October 17, 1973).

**22.**  *See* 38 Fed.Reg. 33577, 33578 (December 6, 1973).

**23.**  *See* 38 Fed.Reg. 31686 (November 16, 1973).

**24.**  *See* 6 C.F.R. § 150.355(d)(3), 38 Fed.Reg. 33578 (December 12, 1973).

authority "for the purpose of minimizing the adverse effects of such [petroleum] shortages . . .." [25]

Section 4(b)(1) of the EPAA set forth nine objectives that were to be achieved "to the maximum extent practicable" in the allocation and pricing regulations that the President was to promulgate.[26] The price control authority conferred by the EPAA was further qualified by § 4(b)(2) of the Act, which required the regulations to provide a "dollar-for-dollar" passthrough of net increases in petroleum product costs.[27]

On December 4, 1973 the President established the Federal Energy Office [hereinafter FEO] and delegated authority to implement the allocation and price stabilization provisions of the EPAA to the Administrator of the FEO.[28] On December 11, 1973, the FEO proposed adopting, without modification, the CLC's Phase IV petroleum price regulations applicable to refiners.[29] Those regulations were adopted by reference on December 27, 1973,[30] and two weeks later they were republished and renumbered.[31]

On May 7, 1974 the Federal Energy Administration Act of 1974 was signed into law. Pub.L. 93–275, 88 Stat. 96, 15 U.S.C. §§ 761, *et seq.*

On May 21, 1974, the FEO issued Ruling 1974–12.[32] Illustrating the flexibility of the regulations with respect to base price calculations, the Ruling gave an example which assumed that a refiner allocated product cost increases of 17 cents per gallon to jet fuel, and also assumed the refiner's jet fuel price to have been 20 cents per gallon on

May 15, 1973. Thus, Ruling 1974–12 assumed a lawful jet fuel base price of 37 cents. However, Ruling 1974–12 also assumed that if the refiner used only five cents of product cost increases in the current month, it would lawfully arrive at "a base price of 25¢ per gallon." Thus "[t]he balance of the . . . increased product cost which was available for use in computing jet fuel prices could . . . have been assigned to other covered products other than special products, or could have been voluntarily 'banked' for recovery in a subsequent month." [33]

In June 1974 the President abolished the FEO and delegated all authority previously exercised by that agency to the new Federal Energy Administration.[34]

## C. THE EVOLUTION OF REFINER PRICE RULES UNDER THE FEDERAL ENERGY ADMINISTRATION

On September 6, 1974, the FEA issued a notice of proposed rulemaking that the agency characterized as the "first proposed comprehensive revision" of the price regulations since December of 1973.[35] The notice indicated that the proposed revisions were designed to accomplish three basic objectives: (1) simplification and clarification of the price regulations; (2) elimination of unnecessary regulatory restrictions; and (3) restoration of competition in place of rigid price regulations.[36]

The notice of the proposed rulemaking did not explicitly address whether the then

---

**25.** *See* Pub.L. 93–159 § 2(b); 1973 U.S.Code Congressional and Administrative News, p. 693.

**26.** *See Standard Oil I,* 440 F.Supp., at 333 fn. 10 (N.D.Ohio 1977).

**27.** *Id.*

**28.** *See* Executive Order No. 11748, 38 Fed.Reg. 33575 (December 4, 1973).

**29.** *See* 38 Fed.Reg. 34414 (December 13, 1973).

**30.** *See* 39 Fed.Reg. 744, 761 (January 2, 1974).

**31.** *See* 39 Fed.Reg. 1924 (January 15, 1974).

**32.** *See* 39 Fed.Reg. 18423 (May 28, 1974).

**33.** *See* 39 Fed.Reg. 18423 (May 28, 1974). The existence of this kind of flexibility was also recognized in the preamble to a corrective amendment published at 39 Fed.Reg. 15138 (May 1, 1974).

**34.** *See* Executive Order 11790, 39 Fed.Reg. 23185 (June 25, 1974).

**35.** *See* 39 Fed.Reg. 32718 (September 10, 1974).

**36.** *Id.*

existing regulations contained a sequence rule requiring refiners to pass through into selling prices *all* accumulated product costs, prior to passing through any non-product costs. Similarly the notice of the proposed rulemaking was mute regarding any proposal that would prohibit the banking of increased non-product costs. Instead the agency proposed to eliminate the pre-notification procedure and adopt an "automatic passthrough" that would allow non-product cost increases to be recovered without pre-notification (but still subject to the profit margin limitation) under a procedure "similar to the procedure now used for the pass-through of increased product costs." [37]

The notice proposed "[m]odification of the regulations to limit the extent to which increased product costs unrecouped in one month may be recouped in subsequent months." [38] There was no suggestion of any corresponding changes with respect to *non-product* costs. The FEA indicated it intended to retain "the essential substantive features of the current non-product cost pass-through regulations." [39]

The notice invited interested persons to submit written comments on the proposed changes, and public hearings were scheduled for September 30 and October 1, 1974. Approximately 20 persons presented formal statements at the public hearings, and the agency received and evaluated comments from more than 80 persons.[40] None of the written comments dealt with the banking of increased non-product costs or with the sequence of cost recoupment.

On November 1, 1974, the FEA issued the first of the regulatory revisions foreshadowed by the September 6 notice.[41] Although the FEA had originally proposed to eliminate banking of product cost increases, the November 1 amendment abandoned this

approach and in its place adopted a limit on the amount of banked product costs that could be passed through in a single month in order to alleviate that month's prices. The limit was set at ten percent of the refiner's total product cost bank.

Based on the comments it had received, the FEA determined that elimination of product cost banks would have an inflationary impact and would have been "impracticable." [42] The FEA had previously acknowledged that the banking provisions permitted refiners "to smooth out price adjustments over a period of time," and "may" have been used by "certain refiners . . . to keep prices at reasonable levels. . . ." [43]

On November 29, 1974, the FEA issued final amendments eliminating the pre-notification requirement. In its statement of the basis and the purpose for the change, the FEA explained, that the "new method will allow product and non-product costs to be calculated using the same 'dollar amount' method of calculation." [44]

At the same time the FEA also limited to certain specific categories the types of increased non-product costs that were recoverable. These categories included refinery labor, fuel additives, utilities, pollution control equipment, containers, interest, and certain marketing costs. The base price concept was not altered.

Prior to the November 29 amendment, refiners could treat oil used to energize refineries as a *product cost.*[45] Because such refinery fuel costs may account for as much as 50 percent of a refiner's total non-product costs, any limitation on the recovery of such costs would have significant impact on refiners. In its notice of proposed rulemak-

37. *Id.*

38. *Id.*

39. *See* 39 Fed.Reg. 32718, 32721 (September 10, 1974).

40. *See* 39 Fed.Reg. 39259 (November 6, 1974).

41. *Id.*

42. *Id.*

43. *See* 39 Fed.Reg. 32718, 32723 (September 10, 1974).

44. *See* 39 Fed.Reg. 42368 (December 5, 1974).

45. *Id.*

ing, the FEA stated that under the proposed change refiners could "generally pass through" the increases in "this important cost item," subject only to a profit margin limitation.[46] There was no explicit indication in the preamble that the change of refinery fuel from the product cost category to the non-product cost category would have any impact on the refiner's ability to recover this significant cost item except for the impact of the profit margin limitation.[47]

The FEA also adopted a new regulation, which had never been explicitly set forth previously. The new section banned the banking of increased *non-product* costs which were not fully recouped in the month after such non-product costs were incurred.[48] The Federal Register, Section 212.83(e)(4), announcement prohibiting the banking of non-product costs does not *affirmatively* state that the prohibition on banking non-product costs was structured in order to impose a *sequence of recovery rule* requiring that all accumulated [49] *product* costs be passed through into actual market prices *before* the pass through of any *non-product* costs into market prices. The December 5, 1974 Federal Register regulatory announcements, on their face, are silent with respect to the crucial sequence of recovery issue.

**46.** *See* 39 Fed.Reg. 32725 (September 10, 1974).

**47.** *See* 39 Fed.Reg. 42356–42369 (December 15, 1974).

**48.** *See* 10 C.F.R. § 212.83(e)(4), 39 Fed.Reg. 42368 (December 15, 1974). For the full text of this provision, and its subsequent regulatory development, *see Standard Oil I*, 440 F.Supp., at 335 fn. 27 (N.D.Ohio, 1977).

**49.** By use of the term "accumulated *product* costs" the court refers to *all* product costs whether previously banked or recently incurred.

**50.** In 1975 Gorman C. Smith was Assistant Administrator for the FEA's Office of Regulatory Programs (Smith's Dep. 10). Smith testified that Mr. Boehl was one of principally two people on whom he relied to investigate malfunctions in the FEA's regulatory structure. (Smith's Dep. 23). Mr. Boehl was also one of the two people on Mr. Smith's staff identified

D. *FEA OFFICIALS REPEATEDLY INTERPRETED THE APPLICABLE REFINER PRICE REGULATIONS IN A FASHION INCONSISTENT WITH THE AGENCY'S CURRENT INTERPRETATION OF THE REGULATIONS GOVERNING THE PERIOD JANUARY 1, 1975 THROUGH JANUARY 31, 1976.*

On November 22, 1974 high level officials of the FEA met with an industry advisory committee established to provide a channel of communication between the FEA and the industry regarding liquified petroleum gas ("L–P gas"). The refiner-plaintiffs uncontroverted rendition of the events of that meeting reveals that Mr. Chuck Boehl, a member of the pricing section of the FEA,[50] informed the group that, as he understood the agency's interpretation of the regulations applicable to L–P gas, non-product cost increases were not bankable. Mr. Boehl then went on to state ambiguously:

"However, *the regulations do not specify* that you have to use your non-product costs before your product costs. So you could, in effect, bank or use your non-product costs or bank your product costs, which seems to be—well, it is rather an odd way of doing it. I am not going to suggest whether they should or should not be bankable. I am just going to say

as having authority to make direct recommendations to the FEA Administrator, Frank Zarb, without first going through Mr. Smith, when the latter was unavailable or did not feel it necessary to become personally involved. (Smith Dep. 509). Mr. Smith was not personally involved in the sequence of recovery question in 1974, and did not learn until February 1976 that Mr. Boehl had made at least two public statements on this issue. (Smith's Dep. 102).

The court recognizes that contemporary statements by high officials like Smith and Boehl are not conclusive on the issue of the proper interpretation of the applicable regulations. However the court concludes that such officials uncontroverted statements, made during the appropriate time frame, and taken in the context of the whole record, illuminate the issue of how a businessman should have fairly interpreted the regulations during that time frame.

we hope to make it clarified one way or the other." (emphasis supplied) [51]

At a meeting of the L–P Gas Industry Advisory Committee held on March 26, 1975, Mr. Boehl said:

"I don't think there is anything that states the product cost is first. You put down your non-product cost first and then supply your product cost." [52]

In January of 1975 the compliance section of Mr. Smith's headquarters staff sent the FEA's field auditors a ten-page insert for Section 3 of a compendium of information called the "CARD Audit Handbook." [53] This document expressly recognized that the regulations did not address the issue of cost recovery.

The handbook insert reported the elimination of the pre-notification procedure and various other changes in the regulations; laid out a series of audit problems that might arise under the new regulations and offered solutions to those problems; and set forth a "Non-Product Cost Increase Schedule" for discretionary use by FEA audit teams in obtaining detailed non-product cost information from refiners. [54] The schedule reflected a proportional recovery concept. It would be impossible to follow all of the steps set forth in the schedule and arrive at a result that left non-product cost increases available for recovery only after recovery of all available product cost increases. [55]

FEA auditors submitted non-product cost schedules, or "work sheets," to refiners in the first part of 1975.

The FEA's auditors told some refiners to use a proportional recovery sequence, furnishing copies of the work sheet for that purpose. [56] During this period, high level officials of the FEA, including members of the General Counsel's Office, knew that the auditors were conduits for providing information, work sheets, and advice to refiners. [57]

Mr. Smith acknowledged that the guidance issued by his headquarters staff in January of 1975 reflected an approach that necessarily entailed recovery of some increased non-product costs before recovery of all product cost increases. [58] In their subsequent explanation of why they considered this approach "authorized" the staff members told Mr. Smith that their conclusion had been based on the fact that "the regulations had no explicit treatment of cost recovery." [59] In the absence of any

---

51. *See* Plaintiffs' Exhibit 3, p. 91, filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

52. *See* Plaintiffs' Exhibit 4, p. 73 filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

53. *See* Smith's Dep. 90–91, 271, and the Audit Manual, contained in the exhibits attached to Smith's Deposition. The FEA has already admitted that the CARD Audit Handbook reflected a sequence of increased cost recovery which is different than the interpretation which the agency now champions. *See* 41 Fed.Reg. 33282, 33283 (August 9, 1976) and discussion in the text accompanying footnotes 42 through 43 in *Standard Oil I, supra.*

54. These schedules, or work sheets, "were not considered to be forms to be filed with FEA. The auditors could submit them to refiners at their discretion, and refiners could fill them out and return them at their discretion." *See* FEA Answer to Sohio Interrogatory No. 37.

55. *See* Smith's Dep. 323–324. The same thinking was reflected in the training manual used during 1975 in the "Refiner Audit Course" where 460 FEA field auditors received formal classroom instruction in how to perform their jobs. *See* FEA Answer to Sohio Interrogatory No. 29 and Plaintiffs' Exhibit 5, pp. 153–158, 175–176 filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

56. *See* Smith's Dep. 320–321.

57. *See* Wilson's Dep. 289–290; Smith's Dep. 246, 307–308.

58. *See* Smith's Dep. 516.

59. In his deposition at pages 321–328 FEA's Assistant Administrator for Regulatory Programs startlingly reveals how the agency advised refiners during 1975 that no *all* product costs first rule governed the applicable regulations.

"Q. Now, if you will turn to Shell Exhibit 4, page 6 of 10, which I believe is the page immediately preceding the page which you have open, that states, does it not, "Attached

clear requirement that costs be recovered in some particular sequence, they told Mr.

Smith they had assumed that the recovery of non-product costs "would be treated in a

is a schedule which the companies should prepare to provide detailed information to the audit team, until such time as the information is reported on the revised FEO–96?

"A. That's right.

"Q. So what you are saying is, this four-page schedule was given to companies with the intent that they rely on it; that they utilize it; that they fill it out and use it for reporting purposes to the FEA?

"A. That's right.

"Q. And, in fact, many companies did utilize this form, did they not—did rely on it?

"A. I am so informed. I, obviously, have no personal knowledge of what the companies did.

"Q. It was certainly not given to companies in an attempt to mislead them in any way?

"A. That's correct.

"Q. And it was given as a means of having them comply with the regulations insofar as this one very narrow, limited facet of them was concerned?

"A. Clearly, it was given to them as a means of reporting and implicit in the four-page schedule was a series of calculations that reflected the understanding of the people who prepared and approved, initially, the schedule of what the regulations meant.

The difficulty was that those people, who understood and issued that in good faith, happened to be wrong. They had an incorrect interpretation of the regulation and 212.-83(d), in fact, spoke not at all to cost recovery. It spoke to cost allocation.

In the revision of FEO–96, the people who prepared this schedule have since informed me that, because the regulations had no explicit treatment of cost recovery, they assumed, incorrectly as it turned out, that cost recovery would be treated in the same way as non-product costs would be treated in a manner analogous to the allocation of non-product costs spoken to explicitly in 212.-83(d).

"Q. Who prepared this four-page schedule?

"A. Members of my Compliance staff in the National Office.

"Q. Have you got their names?

"A. I do not know specifically who prepared this particular schedule.

" . . .

"Q. Do you know who made the decision to distribute what has been marked as Shell's Exhibit No. 3, the CARD Operating Handbook to auditors?

"A. To auditors?

"Q. This was distributed to auditors, was it not?

"A. Again, I don't know the specific individuals. It would have been whoever was in

charge of that function of the compliance program in the National Office.

"Q. It is true, is it not, Mr. Smith, that, if you were to use even very simple numbers through this form, the inescapable result, if your mathematics is accurate, is that it ends up with proportional recovery?

I would be glad to take you through some hypethetical [sic] examples, if you like.

"A. The examples contained in an earlier page of this, for example, on page 3 of 10—that's the package—leaves one to that same conclusion. The answer to your question is, yes, it leads one to the conclusion of proportional recovery.

As I outlined earlier, that is because the people who prepared it thought proportional recovery was authorized.

"Q. In fact, you can't get any other result if your multiplication and addition are accurate. There is no other result you can reach other than the proportional recovery, if you use this form.

"A. If one uses this form only, that's right.

"Q. Now, when was this form first given to the refiners?

"A. I don't know the first date. It appears to be sometime early in January—January '75.

"Q. And when were refiners first alerted by anyone at the FEA that this is not the correct form; that they were being misled?

"A. Refiners generally, as a class?

"Q. Or the refiners who received copies of this.

"A. I don't know. That would depend on the actions taken with respect to the individual refiners. The first general notification was in the preamble to the February 1 ruling.

"Q. When was that?

"A. February, '76.

"Q. So, February 1, '76. What you are saying is that the refiners received this in January or February of '75 were affirmatively misled by your Agency for a period of one year when no one took a step to correct them, in any way, to tell them that this was the wrong approach?

"A. The phrase 'affirmatively misled,' gives me trouble.

"Q. I'll strike 'affirmatively,' if that would make it easier for you.

"A. Let me answer it like this: If a refiner relied solely on this work sheet issued to him for the purpose stated on page 6 of the issuance, should prepare detailed information—should be prepared to provide detailed information to the audit team—if the refiner relied on that work sheet and that work sheet alone for his interpretation of the sequence of cost recoveries, then the refiner could have been misled.

manner analogous to the allocation of non-product costs spoken to explicitly in 212.-83(d)." [60]

As Mr. Smith explained, § 212.83(d), "spoke not at all to cost *recovery*. It spoke to cost *allocation*." [61] (emphasis added). Thus in the statement of the problem on page 3 of the handbook insert, following the question "[h]ow are *recoveries* computed when both PCI [Product Cost Increases] and NPCI [Non-Product Cost Increases] are included in computing price adjustments to May 15, 1973 selling prices," Mr. Smith pointed out that the handbook stated,

> "Q. Did your Agency—and when I say "your Agency," I don't mean just the auditors. I mean anyone in your Agency—provide the refiners who had received this four-page document in January and February of '75 with any instruction, correction, telegram, telephone call, notice of any kind, telling them that they should not rely on this prior to February of 1976?
> "A. If so, I am unaware of it, except for the issuance of Ruling 7516 in September which applied specifically to resellers and retailers but which should have gotten somebody's attention as to which way the Agency was thinking about the whole issue of the sequence of non-product costs recovery.
> "Q. The ruling did not apply to refiners, did it?
> "A. That's correct.
> "Q. And might one have reasonably concluded that the fact that refiners were not included in there would indicate that they were subject to a different treatment? Would that have been a possible or reasonable conclusion for someone?
> "A. It would have been a possible conclusion but, again, given the history of the sequence under the regulations that, until December 31, '75, the absence of anything in the regulations reversing that sequence and the application of the sequence in Ruling 7516, it would seem to me that somebody should have begun to wonder why it was refiners were singled out for more favorable treatment than retailers and resellers under the price regulations, because that had not been the Agency's general practice.
> "Q. Do you know on what date your auditors—when I say 'your auditors,' I mean the Agency's auditors—stopped using this four-page form?
> "A. I do not. They should have stopped using it when they revised FEO–96 or when the FEA P–110 was issued.
> "Q. When was that?
> "A. I don't know. Late '75 sometime.

"*[t]his is not addressed* in Section 212.-83(d)." [62] (emphasis added).

Thus Mr. Smith's uncontroverted deposition clearly indicates that in 1975 the FEA's headquarters compliance staff understood that the regulations *did not expressly mandate an all product costs first* sequence rule for recovering increased costs. However, these same FEA officials apparently believed that Section 212.83(d) should be used "as a guide" to justify a *proportional* recovery sequence. Thus, the method of recovery developed by the compliance staff and presented in the audit handbook was devised as "*an analogue* to 212.83(d)," in ap-

> "Q. Mr. Smith, turning back if you will, just for a moment, to Shell's Exhibit No. 3, I wonder if you could just turn to page 2 of 10.
> "A. All right.
> "Q. Now, we are looking at what is called the CARD Operating Handbook. Is this the same, by the way, as the CARD Audit Handbook?
> "A. That's right. The same thing we are talking about, right.
> "Q. Now, looking at the top paragraph on page 2 of 10, that paragraph entitled 'b' reads:
> 'Section 212.83(d) has been added, for the purpose of describing the application of non-product cost increases to base price computations. Basically, it says that a refiner cannot recover a greater percentage of non-product costs increases on a single covered product than he did in recovering available product costs increases which are included that a month in the base price of that product.'
> Now doesn't that say to you that you should follow the proportional approach?
> "A. That's the statement of the understanding of the people who prepared this material and issued it as to what the regulation meant and it clearly leads to the proportional approach."

**60.** *Id.* Compare 39 Fed.Reg. 42372 (December 5, 1974). Section 212.83(d) specified that the increased non-product and increased product costs used in calculating the maximum price of a particular product had to bear the same ratio as the ratio between the total amount of increased non-product costs and the total amount of increased products available for allocation among all covered products. Section 212.83(d) therefore required refiners to use a proportional approach in allocating product costs increases among various products.

**61.** *See* Smith's Dep. 321.

**62.** *See* Smith's Dep. 328.

parent recognition that Section 212.83(d) did not deal with the subject of cost recovery at all.[63] (emphasis supplied)

The notion that the FEA did not construe the applicable refiner price regulations to embody an all product costs first rule during 1975 is supported by records of meetings attended by several high officials of the FEA in March 1975. The first such document is a memorandum, reflecting the discussion at a meeting conducted on March 5, 1975 on the subject of revising Form FEO–96 in light of the November 1974 amendments to the refiner price regulations. In attendance were officials from Price Waterhouse & Co., who had been engaged by the FEA to assist in resolving various regulatory problems; the Director of the Refinery Audit Review Program; the FEO–96 Technical Project Officer; and representatives from the Office of Compliance and Enforcement, the Office of General Counsel, and the Office of Planning and Analysis. Sequence of recovery was among the "special issues" discussed, and the memorandum states:

"During the discussion of special issues, it was noted that *the regulations,* although specifying that non-product cost increases cannot be carried over, *do not specify in what sequence cost increases are recovered. The result is refiners many [sic] consider non-product costs to be recovered first in any month and product costs second because these increases can be carried over, if not fully recovered.* It was noted that the FEA is currently telling refiners that these costs are recovered pro rata in the same proportion as the cost increases." (emphasis supplied)[64]

63. *See* Smith's Dep. 328–329.

64. *See* Document No. 203NR, p. 2, dated March 5, 1975 and attached to a letter addressed to the court from Sohio's Attorney, David A. Nelson on October 31, 1977 and served on all parties. The court admits Document No. 203NR into the record of this case.

65. *See* Document 202NR, p. 2, dated March 26, 1975 and attached to a letter addressed to the court from Sohio's Attorney, David A. Nelson on October 31, 1977 and served on all parties.

The second document is a memorandum dated March 26, 1975, addressed to the FEO–96 Technical Project Officer from two attorneys in the Office of General Counsel, transmitting comments on the proposed new FEO form. The memorandum expressly states, "The pro rata recovery of product vs. non-product costs is *not* set forth in the regulations." [65]

The third document is a memorandum, which reflects the discussions at a subsequent meeting on the same issue held on March 31, 1975. Most of the participants in the March 5, 1975 meeting were also present on this occasion. As the memorandum reflects, written comments on the proposed new form had been received from the Office of General Counsel, the Office of Planning Policy and the Pricing Regulation Division within the Office of Operations, Regulations and Compliance. The memorandum states that:

"It was decided to strike the language with regard to the pro-rata application of the recouped cost increases. There is nothing in the regulations that requires such a pro-rata application and it was decided that until something is made clear on this issue, the form can reflect only what is in the regulations." [66]

These documents suggest that many high officials in the FEA understood that the regulations, as written in 1975, permitted at least a proportional, non-product cost recovery interpretation.

On April 29, 1975, Mobil Oil Corporation submitted a formal request for an interpretation to the FEA under the procedures articulated in 10 C.F.R. §§ 205.80 *et seq.*[67] In that request Mobil suggested the same regulatory interpretation that was ulti-

The court admits Document No. 202NR into the record of this case.

66. *See* Document 212NR, p. 1, dated March 31, 1975 and attached to a letter addressed to the court from Sohio's Attorney, David A. Nelson on October 31, 1977 and served on all parties. The court admits Document No. 212NR into the record of this case.

67. *See* "Mobil Deposition Exhibit 1" attached to Vol. 1 of David Goss Wilson's Deposition.

**216**

mately adopted in the amended rules that became effective in April 1976.[68]

After the passage of several months the agency told Mobil that the request had been lost.[69] Mobil submitted a second request, identical to the first, on July 30, 1975.[70] This was a period when the agency was "taking longer to respond to requests for interpretation," [71] and neither of Mobil's requests for interpretation had been answered when the FEA promulgated its first explicit sequence of recovery rule in February of 1976.

**68.** *See* 41 Fed.Reg. 15330 *et seq* (April 12, 1976). *Compare Standard Oil I,* 440 F.Supp. at 341.

**69.** *Compare* Wilson Dep. 228 where he testified:

"Q. Has it been your experience that the General Counsel's Office has indeed lost requests for interpretation?

"A. Unfortunately that has occurred in the past at times, yes, sir."

The problem of delay in furnishing prompt interpretations appears to have been endemic to the FEA's Office of General Counsel. On May 13, 1977 John F. O'Leary, an Administrator of the FEA commissioned a Task Force chaired by Stanley Sporkin to study the agency's operations. On July 20, 1977 the *Sporkin Task Force* reported:

". . . [A] review of pending requests for rulings before the General Counsel's Office reveals that some requests, received over three years ago, have not yet even been acknowledged by the Agency. Obviously, this circumstance must be corrected if the Agency hopes to maintain public support." *Sporkin Report,* p. xxii.

The *Sporkin Report* also notes:

"Some of the regions indicated that, on occasion, the National Office of Compliance and the Office of General Counsel did not even respond to telephone calls from lawyers or compliance personnel attempting to follow up requests. The Task Force received information from more than one region which showed extensive periods of time, amounting in some cases to many many months or even years between the time when the matter was sent up for resolution and when the response was received." *Sporkin Report,* pp. III–39 and III–40.

**70.** *See* "Mobil Deposition Exhibits 2, 3, 4" attached to Vol. 1 of David Goss Wilson's Deposition.

**71.** *See* Wilson's Dep. 236–237, where he testified:

On May 1, 1975 the FEA proposed replacing Form FEO–96 with a new form P–110–M–1, accompanied by supporting schedules and instructions.[72] Schedule E of the proposed new form was designed to provide a means for calculating non-product cost increases.[73] That schedule provided for a *proportional allocation* of non-product cost increases among different refined products, but it was silent as to the method or methods under which non-product cost increases might be *recovered.*[74]

"Q. . . . You have told me of the situation extant in the General Counsel's Office upon receipt of these two letters from my client requesting interpretation.

"A. Yes.

"Q. My question to you is, is it reasonable—was it reasonable for even Mobil to expect to receive an interpretation if this is the treatment that it received?

"A. At that point in time it was taking longer to respond to requests for interpretation. Essentially that basic issue was addressed in the February 1, 1976 amendment. Therefore you could say that it took from April to February 1, 1976 to get a basic response to this, for the Agency to address the issue.

"Q. A basic response to my client's request in April took until February—in the issuance of a rulemaking in February of 1976?

"A. Yes, sir.

"Q. That length of time?

"A. Yes, sir.

"Q. And during that period, I ask you one other question, what else could my client have done to find out what that ambiguous regulation meant during the period when, as you claim, it was under analysis assumedly in the Agency?

"A. Your client would have had to use his best effort to interpret the regulations as they existed, as he would at any time if he had a question pending response.

"Q. Because the company had no place else to go, correct?

It had done everything required by statute, correct?

"A. It would have to do everything that a firm normally has to do whenever it has an issue of interpretation, which is to make its own analysis and proceed accordingly, primarily pending a resolution of the issue."

**72.** *See* 40 Fed.Reg. 19120 (May 1, 1975).

**73.** *See* 40 Fed.Reg. 19132 (May 1, 1975).

**74.** *See* 40 Fed.Reg. 19133–19134 (May 1, 1975).

Additional documents obtained from FEA further delineate the agency insiders' interpretation that the applicable regulations did not impose an *all* product costs first sequence rule. On November 12, 1975, Gordon W. Harvey, Director of FEA's Office of Compliance and Program Development wrote an internal memorandum to J. Peter Luedtke, FEA Deputy General Counsel for Pricing, stating:

"On 12/5/74 FEA published regulations permitting refiners to pass through increased non-product costs without prenotification to FEA. These regulations made no provision for the recovery of the nonproduct cost increases. However, both General Counsel and Compliance held the interpretation that such recoveries were to be made on a pro rata basis with the recovery of increased product costs.

"On 1/17/75, the National Office RARP issued instructions and a worksheet (CARD Audit Handbook # 3, 1975–1) which reiterated the interpretation of pro rata recoveries. Audit teams were instructed to provide copies of the worksheet to the refiners and did so. Therefore, the oil industry had been using the compliance worksheet in computing recoveries of product and nonproduct cost increases.

"  .   .   .

"Section 212.83(d) discusses the pro rata method [*i. e.* proportional] of recovery of nonproduct cost increases when such would result in a price above the base price. However, no mention is made of the recovery of such costs when the price being charged is below the base price. *Consequently, oil companies and FEA compliance interpreted the regulations to be the same in both situations.*

"  .   .   .

"  'FEA may be committed to that interpretation for the period that the guidance has been available, but we could issue a ruling which changes that interpretation on a prospective basis. It would seem unfair to require refiners to make a retroactive adjustment when they followed our guidance in good faith.' "[75]

### E.   EVENTS AFTER JANUARY 1976

On December 22, 1975, the Energy Policy Conservation Act of 1975 (hereinafter, "EPCA"], Pub.L. 94–163, became law. Section 402(a) of the EPCA amended the EPAA, Pub.L. 93–159, § 4(b)(2)(A) to insure that petroleum price regulations:

"Shall provide for a dollar-for-dollar passthrough of net increase in the cost of crude oil, residual fuel oil, and refined petroleum products at all levels of distribution from the producer through the retail level  .   .   .."[76]

On January 7, 1976, the FEA announced a Notice of Proposed Rulemaking in preparation for designing amendments to the petroleum refiner price regulations in order to reflect the policy adjustments which Congress mandated by enacting the EPCA, Pub.L. 94–163.[77] The January 7, 1976 notice did *not* explicitly state whether all product costs must be passed through into price increases before any non-product costs could be passed through into a price increase, nor did it state that the FEA viewed this question as an issue to be resolved in the upcoming rulemaking proceeding.

On February 1, 1976, after conducting a public hearing,[78] the FEA issued a new regulation, 10 C.F.R. § 212.85, expressly stating that *all* product costs *must* be

---

**75.** *See* Supplemental Exhibit 1, pp. 1–3 (emphasis added), attached to "Supplemental Reply Brief of the Standard Oil Company," filed on October 14, 1977. *See also* Document No. 90, which is also attached to the October 14, 1977 motion. All documents attached to this Supplemental Reply Brief are admitted into the record of this case.

**76.** For a discussion of the language amended, *see Standard Oil I,* 440 F.Supp. *supra,* at 335 fn. 28.

**77.** *See Standard Oil I,* 440 F.Supp. *supra,* at 335 fn. 29.

**78.** *See Standard Oil I,* 440 F.Supp. *supra,* at fn. 30.

passed through into increased purchaser [79] prices before *any* non-product costs could be passed through into increased purchaser prices. The new regulations retained the old rule that non-product costs which were *not* passed through into price increases,[80] within a specified time,[81] could not be "banked" for recoupment at a later date.[82] The February 1, 1976 regulations also retained the rule that product costs, which a refiner chose not to immediately pass through into his base price [83] *could* be banked, and thus stored for recoupment at an indefinite future date. The February 1, 1976 rule, expressly mandating the "all product costs first" [84] sequence for price increases, applied to all price increases *from February 1, 1976 forward,* as a component of the regulatory amendments generated in response to the enactment of the EPCA, Pub.L. 94–163, in December 1975. The preamble to the February 1, 1976 promulgation affirmatively admitted the FEA's previously "proposed regulations were silent" on the sequence of recoupment. Nevertheless in that same preamble the FEA concluded that the regulations governing the period January 1, 1975 through January 31, 1976 *implicitly* embodied an identical "all product costs first" sequence rule.[85]

The pertinent events following the February 1, 1976 preamble announcement, and regulatory promulgation are detailed in this court's Memorandum of Opinion denying the FEA's motion to dismiss. *See Standard Oil I,* 440 F.Supp. *supra,* at 338. The February 1, 1976 promulgation triggered an immediate storm of protest from two classes of refiners. Prior to February 1, 1976 one class of refiners had interpreted the applicable regulations to permit a "Reverse Sequential" [86] approach to passing through increased costs into prices charged their customers, while a second class of refiners had interpreted the applicable regulations to permit a "proportional" [87] approach to the passthrough of increased costs into prices charged.[88] On March 3, 1976, the FEA, for the first time, explicitly solicited information regarding the economic impact of the February 1, 1976, "all product costs first" passthrough sequence rule.[89] At the same time, the FEA admitted that "clarifying amendments . . . with respect to the order in which increased non-product costs were to have been recovered under regulations in effect prior to February 1, 1976" [90] might be appropriate.

In a Memorandum dated March 5, 1976, Mr. Boehl,[91] advised Mr. Smith that, "a quick survey of 65 refiners who were audited in 1975" disclosed only six refiners that recovered non-product costs last. A more detailed survey taken by the FEA in September of 1976 disclosed that subject to one possible exception, every major refiner in the United States had been using a method

---

**79.** As used here, purchasers are those who buy from refiners.

**80.** As used here, the term price increases refers to prices which refiners charged those who purchased from them.

**81.** The non-product costs had to be passed through in the month after the month in which they were incurred. *See Standard Oil I,* 440 F.Supp. *supra,* at 335–336 fns. 27, 31.

**82.** By "banked" the court means that such cost increases could be stored for passthrough in the future. *See* discussion in *Standard Oil I,* 440 F.Supp. *supra,* at 338 (N.D.Ohio, 1977).

**83.** By not immediately passing through all product costs into base prices, refiners served the goal of reducing inflation by keeping its actual selling price *below* the *maximum lawful* price.

**84.** By use of the term "all," the court means recently incurred product costs in addition to accumulated previous product cost increases which had been banked.

**85.** *See* discussion in *Standard Oil I,* 440 F.Supp. *supra,* at 338 (N.D.Ohio, 1977).

**86.** *Id.*

**87.** *Id.*

**88.** *Id.* at p. 26,621.

**89.** *Id.* at pp. 26,621–26,624.

**90.** *Id.* at p. 26,624, quoting 41 Fed.Reg. 9196, 9200 (March 3, 1976).

**91.** *See* fn. 50, *supra.*

of cost recovery different from the method that the FEA now claims was required.[92]

On March 18, 1976, FEA conducted a public hearing at which both the Reverse Sequential and Proportional Refiners catalogued the dire economic consequences which the *"all product cost first"* sequence rule would inflict on the American public, as well as on the refining industry. This court already has examined the tenor of the industry's critique.[93]

Sohio's experience with the sequence rule in February of 1976 illuminates the problems created by the new rule. As soon as the rule was issued, Sohio started disposing of refined products that would otherwise have been placed in inventory. At the same time, Sohio cut back on the amount of crude oil it purchased to process in its refineries, to the extent that prior contractual commitments permitted. Despite these efforts to reduce monthly non-product costs by endeavoring to balance monthly sales and monthly production, Sohio found that the new sequence rule would result in loss of the opportunity to recover costs of almost six million dollars for February 1976 alone. Sohio explained in the presentation it made to the FEA in March that Sohio would have to cut back refinery operations even more sharply in the ensuing months if the rule was not repealed.[94]

On April 6, 1976, the FEA rescinded § 212.85, the *only explicit* "all product cost first" rule it had ever promulgated, ordering the rescission effective *retroactively* as of the date on which § 212.85 was issued.[95] This court has already outlined the reasons stated by the FEA for revoking its only explicit all product costs first rule.

" . . . [T]he FEA catalogued a wide array of adverse consequences that could be expected to flow from the 'product-cost first' rule in combination with other restrictions in the regulations. Specifically, the FEA stated that the rule 'would tend to have undesirable inflationary effects on current market prices,' that 'prices would also tend to wide monthly fluctuations,' that the rule could operate as 'a disincentive for refiners to build up inventories,' that it would provide refiners an incentive to 'decrease refinery production,' and that, because of the restrictions, 'capital investment to expand refiner capacity might be reconsidered and deferred or eliminated.' " [96]

In addition to rescinding the February 1, 1976 regulatory promulgation, the April 6, 1976 regulatory amendments revamped the regulatory structure, for the time frame February 1, 1976 forward, in a fashion which erased the increased all non-product/product costs first passthrough sequence concept.[97] Nevertheless, that question was left unresolved with respect to the time frame January 1, 1975 through January 31, 1976.[98] According to David Goss Wilson, ultimately the FEA decided that it would not amend the 1975 regulations, but that "procedurally it would be better to go the proposed class exception route than to issue a proposed retroactive rulemaking." [99]

On August 3, 1976 the FEA announced that it was currently considering a "Proposed Class Exception" for at least some of the refiners who, between January 1, 1975 and January 31, 1976, had passed non-prod-

**92.** *See* Smith Dep. 496, 498–499, 501; Sohio's Exhibit 2 attached to Vol. 3 of Smith's Deposition.

**93.** *See Standard Oil I,* 440 F.Supp. *supra,* at 341 fn. 38.

**94.** *See* Plaintiffs' Exhibit B–2 accompanying the plaintiffs' joint brief filed on May 16, 1977, in opposition to the defendants' motion to dismiss.

**95.** *See Standard Oil I,* 440 F.Supp. *supra,* at 341 (N.D.Ohio, 1977). The rescission was effective as of February 1, 1976.

**96.** *See Id.,* at fn. 40. *Compare and contrast, Id.* at fn. 10.

**97.** *See Id.* at 26,625, noting that the FEA adopted a "proportional" approach for the period February 1, 1976 forward. In fact however, the effect of the amendments was virtually to reverse the sequence put into effect on February 1, 1976.

**98.** *See* discussion *Id.,* at 26,625.

**99.** *See* Wilson Dep. 105.

uct costs into price increases in a fashion different than the *all product cost first rule.* Previously this court noted that on August 3, 1976,

"The FEA acknowledged that some refiners might, in 'good faith' have 'misinterpreted' the regulations to permit recoupment of non-product costs on a proportional basis; that the FEA audit manual also 'partially reflected this view;' that the regulations contained 'possibly ambiguous language;' that refiners might have been misled by 'certain information disseminated by FEA;' and that enforcing an all 'product-cost first' approach might result in 'potentially *massive refunds or bank reductions,*' which could have a drastic effect on the cash resources of refiners who in good faith set prices on a proportional interpretation of the regulations. (emphasis added). *See* 41 Fed. Reg. 33282, 33283 (August 9, 1976)." [100]

On September 14, 1976, FEA Administrator Zarb sent an explanatory letter to Chairman Moss of the Oversight and Investigations Subcommittee of the House Committee on Interstate and Foreign Commerce. In that letter Mr. Zarb stated that "[t]he regulations in effect during that period [January, 1975 through January, 1976] contained ambiguities with respect to whether . . . all increased product costs had to be recovered before any increased non-product costs could be recovered." [101]

A similar admission was made by Mr. Wilson in an interview with a reporter for the *Wall Street Journal.* The ensuing article, published on September 10, 1976, announced that "[t]he Federal Energy Administration said it and the oil industry made a pricing mistake that could cost consumers $1.3 billion." [102] The article quoted Mr. Wilson as saying that the FEA proposal to allow the industry to keep the 1.3 billion dollars would be "to bless what's already been done." [103]

On the same day the article appeared, Mr. Wilson received a telephone call from the staff counsel of the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce, chaired by the Congressman John Dingell. [104] Mr. Wilson was informed that Congressman Dingell, was disturbed by the agency's position and that he had decided to convene a subcommittee hearing on the matter for September 20. [105]

On September 17 Congressman Dingell issued a strongly worded press release announcing that his subcommittee had scheduled a hearing to look into what was characterized as a "scandalous example of what can happen when a regulatory agency becomes intimate with those whom it regulates." [106]

Mr. Smith, accompanied by Mr. Wilson, appeared at the hearing to present the agency's position. [107]

At the outset of the hearing Congressman Dingell distributed an opening statement [108] which referred to "the question whether a possible ambiguity exists" in the regulations. The statement disposed of that question by stating that "[a]ny further examination of the regulatory language is

**100.** *See Standard Oil I,* 440 F.Supp. *supra,* at 342 (N.D.Ohio, 1977).

**101.** *See* Plaintiffs' Exhibit 6, filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

**102.** *Compare* the FEA's survey data released on September 20, 1976 at 41 Fed.Reg. 40559, and discussed in the text accompanying footnotes 44–47 in the *Standard Oil I, supra* opinion.

**103.** *See* Plaintiffs' Exhibit 7, filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

**104.** *See* Wilson's Dep. 129–130.

**105.** *See* Wilson's Dep. 130 and Plaintiffs' Exhibit 7.

**106.** *See* Plaintiffs' Exhibit 8 filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

**107.** *See* Wilson's Dep. 131; Smith's Dep. 68.

**108.** *See* Plaintiffs' Exhibit 9 filed on September 14, 1977 in support of the plaintiffs' motion for summary judgment.

unnecessary" in view of the FEA's "admission" that it "believes" its product cost first interpretation was correct.[109]

Mr. Smith, as spokesman for the FEA, proposed to read a prepared statement.[110] Congressman Dingell elected not to hear Mr. Smith's testimony, and said that "he would not hold the hearings until Mr. Zarb or Mr. Hill were prepared to testify. . . . ."[111]

Mr. Zarb and Mr. Wilson met privately with Congressman Dingell the following day in an effort to persuade him to cancel the proposed hearing altogether.[112] The Congressman was assured "that it was not the intent of the Agency to excuse any firm from complying solely because it had relied in good faith upon an erroneous interpretation." That assurance apparently made Congressman Dingell "feel much better."[113]

A letter from Mr. Zarb to send Congressman Dingell was drafted "right after the meeting," and the text of the draft was cleared with Congressman Dingell's staff counsel, who offered a few minor suggestions, "most" of which were adopted.[114] The final version of the negotiated letter committed the agency to a hard line in the exception proceedings and eliminated any class exception relief for refiners who did not adhere to the all product-costs first sequence approach during the period January 1, 1975 through January 31, 1976.[115]

On October 5, 1976, the FEA published a Federal Register notice echoing the views stated in Zarb's letter.[116] Paradoxically, the FEA's October 5, 1976 Federal Register notice openly admits that, "FEA acknowl-edged in its August 3, 1976 notice that refiners might have concluded in good faith that other interpretations of the regulations than the sequential interpretation adopted by the FEA *were correct*. . . . "[117] (emphasis added). Ever since the Dingell-Zarb encounter, the FEA has steadfastly maintained that its regulations governing the period January 1, 1975 through January 31, 1976 clearly contained an implicit *"all product costs first"* sequence rule. The court now examines the FEA's arguments in support of the Dingell-Zarb interpretation.

### III.

THE FEA's REFINER PRICE RULES GOVERNING THE TIME FRAME JANUARY 1, 1975 THROUGH JANUARY 31, 1976 DID NOT REQUIRE ALL INCREASED PRODUCT COSTS TO BE PASSED THROUGH INTO THE PRICES THAT REFINERS CHARGED THEIR CUSTOMERS BEFORE REFINERS COULD PERMISSIBLY PASS THROUGH NON–PRODUCT COST INCREASES INTO MARKET PRICES.

A. *THE APPLICABLE REGULATIONS ARTICULATE NO EXPRESS ALL PRODUCT COSTS FIRST SEQUENCE RULE.*

The language of the FEA's applicable regulations do not state an explicit rule governing the sequence of cost recoupment. However, the FEA maintains that the "base price concept," including the applica-

---

**109.** *Compare* 41 Fed.Reg. 33283 (August 9, 1976) where the agency stated that it could not find "any arguable basis" for concluding that the regulations did not prohibit refineries from recovering increased non-product costs first. That is still the agency's official position. *See* FEA Answer to Sohio's Interrogatory No. 47. *Compare* text accompanying fn. 117, *infra*.

**110.** *See* Plaintiffs' Exhibit 1, filed on September 14, 1977, in support of the plaintiffs' motion for summary judgment.

**111.** *See* Wilson Dep. 131; Smith Dep. 68.

**112.** *See* Wilson Dep. 132, 143.

**113.** *See* Wilson Dep. 134.

**114.** *See* Wilson Dep. 137–138.

**115.** The Zarb letter is quoted in full in the text following footnote 47 of the *Standard Oil I* decision.

**116.** *Id.*

**117.** *See* 41 Fed.Reg. 43953–43954 (October 5, 1976). *Compare Standard Oil I, supra,* fn. 34. *Contrast* fn. 109 and accompanying text in today's Memorandum of Opinion.

ble mathematical formula, and the prohibition against banking non-product cost increases inaugurated an *all product costs first rule.*

The general price rule, 10 C.F.R. § 212.82, prohibited a refiner from charging a price higher than its base price unless it incurred non-product cost increases.[118] The "base price" is defined in Section 212.82 as the weighted average price charged by the refiner to a particular class of purchaser on May 15, 1973, plus product cost increases incurred by the refiner and measured pursuant to Section 212.83.[119] The FEA argues that throughout 1975 and during 1976 the regulations required all available product cost increases, including product costs "banked" in prior months and available for recovery in the current month, to be included in the base price for purposes of computing maximum allowable prices. In addition, the FEA claims that the refiners should have inferred a sequence of recovery rule from the general price rule. The FEA's contention is that the price rule not only required refiners *to calculate maximum allowable prices* in a particular fashion, it also required refiners to *deem costs recovered* in the same fashion. Therefore, according to the FEA, non-product cost increases could be recovered only after *all* recently incurred, and previously banked product cost increases had been recovered in the "base price."

To sustain its position that the "regulations permitted non-product costs to be recovered only after the full 'base price' (*i. e.,* the May 15, 1973 selling price plus, *all* available increased product costs) had been recovered,"[120] the FEA must establish two

points. If the agency is incorrect about either one of them its "base price" argument fails.

*First,* FEA must show that the price rule also inaugurated a rule dictating a sequence for the passthrough of increased costs. If the price rule does not set forth a sequence of recovery rule, this matter is at an end.

*Second,* FEA must show that the *"base price"* calculation necessarily included all recently incurred, and previously banked product cost increases. If a refiner could withhold product cost increases from its base price and "bank" them for later recovery, it could set the base price low enough to allow the recovery of those non-product costs increases which the market would pay in the current month, before the refiner recovered *all* recently incurred, and previously banked product cost increases. Thus, if the *"base price"* calculation, as semantically and mathematically set forth in the applicable regulations, failed to clearly direct a refiner to pass through *all* accumulated product costs into market prices, before passing through any non-product costs into market prices, then the FEA's argument is specious.

The FEA carefully delineates the history of the applicable FEA regulations, and dissects the terms of those regulations, in order to buttress its assertion that the *maximum price rule* also specified a *sequence of cost increase recovery,* and that the base price calculation mandated the passthrough of *all* banked and recently incurred product cost increases ahead of the passthrough of *any* non-product costs. The FEA's recitation of regulatory history is not persuasive.

---

**118.** "A refiner may only charge a price in excess of the base price of the covered product in order to recover on a dollar-for-dollar basis increased non-product costs incurred between the month of measurement and the month of May 1973. . . . ."

10 C.F.R. § 212.82(c) (1975). *See also* 10 C.F.R. § 212.82(b), 39 Fed.Reg. 1952 (Jan. 15, 1974); 6 C.F.R. § 150.358, 38 Fed.Reg. 22541 (Aug. 22, 1973).

**119.** "The base price for sales of an item by a refiner is the weighed average price at which the item was lawfully priced in transactions

. . . on May 15, 1973, plus increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.83."

10 C.F.R. § 212.82(b) (1975). *See also* 10 C.F.R. § 212.82(f), 39 Fed.Reg. 1953 (Jan. 15, 1974); 6 C.F.R. § 150.358(g), 38 Fed.Reg. 22541 (Aug. 22, 1973).

**120.** *See* FEA's memorandum in support of its motion to dismiss or in the alternative to stay, at page 11, filed on May 2, 1977.

In August 1973, the CLC published the Phase IV price control regulations which applied to the manufacturing sector of the economy in general.[121]  The Phase IV *general regulations* required all manufacturers to compute fixed base prices; requiring firms to pre-notify their cost rooted price increases 30 days in advance; permitting price increases above base price to reflect only allowable cost increases, subject to productivity offsets and a profit margin limitation; and imposing a system of rate-based cost justification under which allowable cost increases could be passed through on a prospective basis, and only in the form of a percentage increase to the base prices of the firm's products, and only so long as they continued to be incurred.  The Phase IV cost related price increase reporting form was the Form CLC–22.[122]

The Form CLC–22 instituted a rate basis of cost computation, under which allowable cost increases were expressed as a percentage increase in current costs over base cost levels.  After appropriate adjustments for volume and productivity increases, this percentage figure was the percentage price increase which could be applied *prospectively* under the CLC–22 to the base price of the product line concerned.  Cost increases which were incurred prior to price increase approval by the CLC and which could not be passed through during the pre-notification period, also could not be banked for subsequent recovery but had to be absorbed by the manufacturer.

The FEA contrasts the CLC's generally applicable Phase IV regulations, with the parallel, special regulatory treatment extended to the petroleum refining industry under the Phase IV complex.  On August 22, 1973, one week after the CLC promulgated its Phase IV *general regulations,* the Council adopted special regulations applicable only to the petroleum industry [hereinafter, *"Subpart L"*].[123]  As noted earlier, Dr. Dunlop, Chairman of the CLC explained the special need for petroleum price control regulations that would strike a *balance* between keeping prices as low as reasonably possible, without adversely affecting the availability of petroleum products.  Accordingly, when the Phase IV petroleum regulations were issued, a key difference between the Subpart L rules pertaining to refiners, and the Phase IV general regulations pertaining to the manufacturing sector generally, was their different treatment of certain increased costs.  Under the Phase IV Subpart L regulations, increases which refiners incurred in purchasing certain raw materials (*i. e.,* the increased costs of imported crude oil and petroleum products and the increased costs of domestic crude oil) were allowed to be passed through on a dollar-for-dollar basis automatically each month, as part of a refiner's "base price," [124] without regard to any of the restraints imposed on the economy's manufacturing sector by the Phase IV general regulations.[125]

Refiner price increases to recover all other cost increases, remained subject to the anti-inflationary cost-absorption rules described above, regarding the Phase IV regulations applicable to the general manufacturing sector of the economy; *i. e.,* refiner cost increases, which were *unrelated* to increased costs of imported crude oil, imported petroleum products, and raw domestic crude oil, could only be passed through into augmented prices charged to the refiners customers, *after* pre-notification to the CLC, and then only as a percentage price increase "in excess of the base price." [126]

**121.**  *See* 6 C.F.R. Part 150;  38 Fed.Reg. 21592 (August 9, 1973).

**122.**  *See* Attachment D accompanying the defendants' brief in support of their motion for summary judgment filed on September 14, 1977.

**123.**  *See* 6 C.F.R. Part 150, Subpart L, 38 Fed. Reg. 22536 (November 22, 1973).

**124.**  *See* C.F.R. § 150.358(g), 38 Fed.Reg. 22541 (August 22, 1973).

**125.**  *See* text accompanying footnote 12, *supra.*

**126.**  At this time the regulations contained no provision for banking either product or nonproduct costs.  *Compare* 6 C.F.R. § 150.358(b), (c), (d), (e), (f), (h), (i), (j);  38 Fed.Reg. 22541–22542 (August 22, 1971).

Those costs which were *unrelated* to increased costs of imported crude oil, imported petroleum products, and raw domestic crude oil, formed the nucleus of what eventually came to be known as "non-product costs." The FEA asserts that in August 1973, the purpose of delaying recovery of non-product cost increases until *after* recovery of the base price (*i. e.,* May 15, 1973 selling prices plus increased product costs) and then holding non-product cost increases to the full force of the CLC's anti-inflationary cost-absorption regulations was to "prevent unnecessary price increases." [127]

On September 14, 1973, the CLC shifted its "Subpart L" petroleum refiner price regulations in a fashion radically beneficial to refiners by promulgating the "banking" rule for increased *product costs* which were not passed through immediately when incurred. On that date the CLC published amended regulations substituting for the earlier language a mathematical formula for measuring the precise amounts of increased costs of imports and domestic crude oil which a refiner could allocate among its array of products.[128]

In so amending the regulations the CLC made it clear that refiners would be required to use the formula to compute the *increased product cost* portion of their *base prices.* Thus, the preamble stated:

"Section 150.356 provides a more precise method for calculating the allocation of increased costs of imports and domestic crude petroleum to various products. *The Council has furnished in this amendment a mathematical formula which firms must use in calculating the dollar amount of the increased costs of imports and domestic crude petroleum.* The formula is intended to further implement the Council's intention of allowing recovery of increased costs of imports and domestic crude on a dollar-for-dollar basis. The substance of the corresponding provi-

"The regulatory mechanism selected for this purpose was a 'base price' that could be adjusted upward automatically from month to month by refiners to reflect increases in the costs incurred for imports and domestic crude oil. Inasmuch as the anti-inflationary restraints on cost passthroughs under . . . the Phase IV general regulations applied only when a price *above* base price was to be charged, the device of allowing a refiner's base prices to be adjusted upward automatically to reflect certain product cost increases also automatically avoided the application of these more stringent passthrough regulations to such costs.

"However, as noted, this deviation from . . . the Phase IV general regulations extended only to the specific product cost increases mentioned, i. e., the increased cost of imports and domestic crude oil. All other cost increases remained subject to the more *stringent Phase IV general regulations,* including the authority of the CLC to defer delay, modify or disallow such costs. *See* Attachment E, § 150.358(d) and Attachment C, § 150.154. Significantly, the same Form CLC–22, which was used under the Phase IV general regulations to prenotify all cost increases and to submit quarterly reports, was required to be used by refiners for prenotification and reporting of nonproduct cost increases under the Phase IV petroleum regulations."

**127.** *See* text accompanying footnote 12, *supra.* On pages 15–16 of its brief filed on September 14, 1977 the FEA reasons:

"The decision to allow an automatic right of passthrough for increased product costs prior to passthrough of nonproduct cost increases related to developments in the petroleum industry during and prior to 1973. The United States' domestic petroleum production had leveled off and begun to decline after 1970. At the same time, gas production likewise had begun to decline. Consumption *of both fuels, however, continued to grow,* and it was becoming apparent that the increased demand could be met only through greater use of imported oil and through development of new, more costly domestic reserves. As demand continued to grow, both foreign and domestic prices began to increase.

"Given the fact that other consumer nations more dependent on foreign oil than the United States were bidding against the United States for imports and were willing to pay a premium to avoid supply shortages, the anti-inflationary price control mechanisms of the CLC had to be adjusted in such a way that refiners would continue to have an incentive to import higher cost foreign oil and *to purchase higher cost domestic crude oil.* On the other hand, there was no reason to allow refiners' other costs (i. e., their operating and marketing costs) to escape the more stringent price control mechanism of Phase II and the Phase IV general regulations.

**128.** *See* 6 C.F.R. § 150.356; 38 Fed.Reg. 25687–25689 (September 14, 1973).

sions in the regulations, as originally published on August 17, 1973, has been generally retained. *Having been made aware of some uncertainty among firms as to precisely what form of computations should be employed, the Council developed this formula to provide explicit guidance and to avoid misunderstandings."* (emphasis added) [129]

The language of the regulations similarly reflected this requirement to use the formula to measure increased product costs in computing base prices. The new § 150.-356(c) was amended to read as follows:

(c) *"Allocation of increased costs—(1) General Rule.*—In computing its ceiling prices and base prices for covered products pursuant to §§ 150.355(c) and 150.-358(g), *a refiner may* increase its May 15, 1973 selling prices to each class of purchaser on the first day of each month beginning with September 1973 by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum allowable under paragraphs (d), (e), and (f) of this section, *provided that the amount of increased costs used in computing a ceiling price or base price is calculated by use of the general formula set forth in paragraph (c)(2) of this section."* (emphasis added) [130]

The September 14, 1973 rulemaking also introduced procedures for *"banking"* unrecouped increases in the cost of imports, by adding the following proviso to the general cost allocation regulation in § 150.356(c)(1):

"If, in any month beginning with September 1973, a firm establishes *a base price* for any covered product or a ceiling price for No. 2 heating oil *which does not include the entire amount of increased costs calculated pursuant to this formula* and allowable under paragraphs (d), (e), and (f) of this section for a particular item, the unused portion *may be added* to

the May 15, 1973, selling price to compute the respective base price or ceiling price for a subsequent month. (emphasis added) [131]

Citing these regulations, the FEA argues that the September 14, 1973 creation of the increased product costs banking rule gave no indication that the sequence of increased costs recovery, which the FEA maintains was inherent in the original "Subpart L" refiner price regulations, was altered.[132] The FEA reaches this conclusion relying on: (1) those regulations which continued to specify that non-product cost increases could be recovered only pursuant to the pre-notification procedures applicable generally to all firms and only then by charging a price "in excess of the base price;" and (2) those regulations which continued to define base price as May 15, 1973 selling prices *plus* increased cost of imports and domestic crude oil measured pursuant to the formula in $150.356(c)(2).

■ The point which the FEA misses, is that the allocation of increased costs provision of § 150.356(c) and the new increased product costs banking provision embodied in § 150.356(c)(1) were both couched in terms of *"may,"* thus vesting refiners with discretion to either pass through increased product costs by adding them to base prices under § 150.356(c), or to bank increased product costs and pass them through at some future date, under § 150.356(c)(1), when the refiners *"may"* deem it appropriate to do so. This banking approach represents a significant departure from both the CLC's Phase IV general regulations applicable to the manufacturing sector and with the earlier Subpart L refiner regulations. The discretionary "banking" of product costs rule furnished greater product acquisition incentives to refiners than the old Subpart L, because it not only *allowed* increased product costs to be passed through automatically as part of base prices in the

---

129. *See* 38 Fed.Reg. 25687 (September 14, 1973).

130. *See* 6 C.F.R. § 150.356(c)(1); 38 Fed.Reg. 25688 (September 14, 1973).

131. *Id.*

132. *See* Defendants' Brief, p. 19, in support of their motion for summary judgment filed on September 14, 1977.

current month, but it also furnished refiners with an incentive to purchase raw petroleum products, at rising costs, by guaranteeing an opportunity to recover such increased product costs at a future date, if, for market reasons, they could not be recouped immediately. Thus the promulgation of the banking rule represents a shift away from a "cost absorption" theme in the refiner price regulations, toward a cost passthrough incentive for refiners, and was obviously calculated to induce them to serve the national interest by financing a steady flow of raw petroleum products into this country.[133] At the same time the CLC did not dilute the inducement effect of the new discretionary product cost banking rules by altering any portion of the well-established mechanism that, non-product costs, if prenotified, could be passed through into price increases, on top of *whatever base price the refiner selected.* Any alteration of the prenotified non-product costs passthrough on top of "base prices" rule, simultaneously with the promulgation of the innovative, discretionary product cost banking rule, in the direction of requiring *all* banked product costs to be exhausted through increments to base prices, prior to pre-notified non-product cost passthroughs, would have destroyed the raw product procurement incentive of the new banking rule and rendered its promulgation nugatory. Therefore, the court concludes that the September 14, 1973 promulgation of the increased product cost banking rule was crafted to chart a refiner cost recovery mechanism different from the sequence of recovery, cost absorption thesis, which the FEA maintains was inherent in the original Subpart L.[134]

FEA argues that the CLC's regulatory amendments to the *formula* incorporated into §§ 150.356(c), 150.356(c)(1) "implicitly" imposed on all product costs first sequence of recovery rule. The FEA focuses on the "G" factor which it asserts was added to the formula to reflect banked product cost increases in the computation of base prices. The agency notes that after December 6, 1973, the general formula for computing the amount of increased product costs was described as:

"$d_i u$ = The dollar increase that *may be* applied in the period 'u' (the current month) to the May 15, 1973 selling price of a special product or products of the type 'i' to each class of purchaser *to compute the base price to each class of purchaser.  .  .  .* " (emphasis added)[135]

The analogous formula for computing increased non-product costs was described as:

"$d_i e$ = The dollar amount that *may be added to each base price* of the special product or products of the type 'i' in the period 'e' (the consecutive 12 month period).  .  .  .*" (emphasis added)[136]

Under the formulae, increased product cost increments (represented by the symbol "$d_i u$") could be added to the May 15 selling prices of special products for the purposes of computing base prices, while increased non-product cost increments (represented by the symbol "$d_i e$") were to be added to base prices. Thus a base price had to be computed *before* any non-product costs could be passed through.

In addition, the inclusion of a "G" factor in the increased product cost allocation formula to reflect banked costs in the symbol "$d_i u$," and the absence of an analogous provision in the formula for the allocation of increased non-product costs, made it clear, *according to the FEA*, that *all banked costs were to be included in the computation of base prices and that only increased product costs were to be banked.*[137] The FEA then

---

**133.**   *See* fn. 12, 83, *supra.*

**134.**   *See* 38 Fed.Reg. 30268 (November 11, 1973) where the CLC again stressed the need to encourage procurement of raw product.

**135.**   *See* 6 C.F.R. § 150.356(c)(2)(ii); 38 Fed. Reg. 33580 (December 6, 1973).

**136.**   *Id.*

**137.**   The "G" factor was defined as follows:

furnishes an example to illustrate its understanding of the applicable formula.[138] The CLC regulations, with the December 1973 amendments to the maximum price calculation formula, were renumbered and repromulgated by the FEO on January 14, 1974.[139]

The court is not persuaded by the FEA's view that the maximum price formula, defined by the CLC in December 1973, *implicitly* imposes a sequence of recovery rule. As discussed above, *the price rules explicitly gave a refiner discretion over the amount of increased product costs to be included in* *the base price of any product.* The regulations said a refiner "*may*" increase the base price to reflect increased product costs;[140] "may," subject to certain limitations, allocate increased product costs to the base price of different products in whatever amounts it deems appropriate;[141] and "may" bank increased product costs for use in a subsequent period.[142]

The agency contends that the value of "$d_i$ u," which is arrived at by performing the computations contemplated by Section 212.-83(c)(2),[143] is the amount of increased prod-

> "Git = Jit – Kit which is *the total dollar amount of increased costs of product or products of the type 'i' not recovered in sales of that product through the period 't' (the month of measurement)* that have been carried forward pursuant to paragraph (d) of this section or the total excess revenues derived from sales of the product or products of the type 'i' which must be subtracted pursuant to paragraph (d) of this section." *Id.* (emphasis added)

138. On pages 24–25 of their brief, filed on September 14, 1977, in support of their motion for summary judgment the FEA offers the following analysis of the CLC regulatory structure.

"To demonstrate how all increased product costs including banked costs were incorporated into base prices, it is helpful to understand how the formula for the allocation of increased product costs in § 150.356(c) worked.

". . . .

"Assuming that a refiner were using this formula to calculate the increased product costs which it could allocate to the special product, gasoline, in a given month, then the formula would be translated as follows:

| "The total dollar amount of increased product costs allocable to gasoline in the current month ('u') for purposes of computing the base price of gasoline to each class of purchaser of gasoline | The total dollar amount of increased cost of crude oil incurred in the month of measurement and allocable to gasoline | The total dollar amount of increased costs of gasoline purchased or landed in the month of measurement | The total dollar amount of unrecouped banked increased product costs incurred prior to the month of measurement and allocable to gasoline | The amount of increased product costs allocable to gasoline which the refiner chooses to allocate to other covered products |
|---|---|---|---|---|
| = | + | + or | – |  |

The volume of gasoline which the refiner estimates it will sell in the current month"

---

139. *See* 38 Fed.Reg. 1924 (January 15, 1974).

140. *See* 6 C.F.R. § 150.356(e)(2)(i), (ii); 38 Fed. Reg. 33580 (December 6, 1973). 10 C.F.R. § 212.83(c)(1)(i), (ii); 39 Fed.Reg. 1955 (January 15, 1974).

141. *Id.*

142. *See* 6 C.F.R. § 150.356(d)(1), (2); 38 Fed. Reg. 33581 (December 6, 1973). 10 C.F.R. § 212.83(d)(1), (2); 39 Fed.Reg. 1956 (January 15, 1974).

143. *See* 39 Fed.Reg. 1955 (January 15, 1974). 38 Fed.Reg. 33580 (December 6, 1973).

uct costs that *must* be included within base price. The agency attempts to illustrate the use of the formulae by explaining how "$d_iu$" would be computed for gasoline. However, the agency's approach fails to take into account that the formula's definition of "$d_iu$" is "[t]he dollar increase that *may* be applied . . . to the May 15, 1973 selling price . . . to compute the base price . . ." § 212.83(c)(2).[144] Significantly, the FEA's example of the application of the price rules and incorporated formula does not reflect the discretionary language in the definition of "$d_iu$."[145]

The original CLC Phase IV Subpart L base price definition stated that increases in product costs were to be "measured pursuant to Sections 150.356 and 150.357."[146] Those sections in turn said that refiners "may . . . include" product cost increases in their base prices of those products.[147] Likewise, the original CLC banking regulation unquestionably contemplated that a refiner could apply less than all of its available product cost increases in calculating its base price. It pertained only if a refiner "established" a base price that did "not include the entire amount of increased costs . . . allowable."[148]

On April 30, 1974, the Federal Energy Office confirmed that the regulations permitted a refiner to apply less than all of its available product costs increases in computing base prices. In adopting a technical change to 10 C.F.R. § 212.83, the agency said of the base price rule "if all costs [are] not initially applied to prices, they may be carried forward . . ." 39 Fed.Reg. 15138 (May 1, 1974).

The FEO held the same in Ruling 1974–12. 39 Fed.Reg. 18423 (May 24, 1974).

There the FEO gave a hypothetical example in which $340,000 in product cost increases was available for increasing the price of jet fuel for a particular month. The Ruling said:

"For example, firm A could have allocated $100,000 of its increased product cost to jet fuel, which would have resulted in 5¢ per gallon of increased product cost and a base price of 25¢ per gallon of jet fuel. *The balance* of the $340,000 in increased product cost that was *available for use in computing jet fuel base prices* could then have been assigned to other covered products other than special products, or *could have been voluntarily 'banked' for recovery in the subsequent month. Id.* (Emphasis added.)"

These interpretations of the base price rule, first by the CLC and then by the FEO, are inconsistent with the FEA's present position. If product cost increases available for recovery in the current month could be held back in calculating the current month's base price and could be allocated directly to banks for recovery in subsequent months, then a refiner could apply pre-notified non-product cost increases to that current base price and recover them *before* it recovered all product cost increases available for recovery.

The court concludes that the notice proposing comprehensive amendments to the price regulations in September of 1974, and the rules ultimately adopted, do not suggest that the FEA structured the price rule in a fashion requiring refiners to include *all product costs* in their base prices before they could apply increased non-product costs over their base price.

---

**144.** The regulations themselves clearly distinguish between "may" and "must." For example, the regulations state that where a refiner charges prices that result in an over-recoupment of product costs, the excess revenues "must be subtracted from the May 15, 1973 selling prices to compute the base prices" in a subsequent month. § 212.83(d)(1); 39 Fed. Reg. 1952, 1956 (January 15, 1974).

**145.** *Contrast* fn. 138, *supra.*

**146.** *See* 6 C.F.R. § 150.358; 38 Fed.Reg. 22541 (August 22, 1973).

**147.** *See* 6 C.F.R. §§ 150.356(e), (f), 150.357(c), (d); 38 Fed.Reg. 22540–22541 (August 22, 1973).

**148.** *See* 6 C.F.R. § 150.356(c)(1); 38 Fed.Reg. 25688 (September 14, 1973).

B. *THE REFINING INDUSTRY'S RE-ACTION TO PROPOSED FORM FEA P–110–M–1, PUBLISHED IN THE FEDERAL REGISTER IN MAY 1975, DOES NOT DEMON-STRATE THAT REFINERS UN-DERSTOOD THAT THE FEA IN-TERPRETED ITS REGULATIONS TO EMBRACE AN ALL PRODUCT COSTS FIRST RULE.*

The FEA relies on the reaction from one segment of the refining industry to *proposed* Form P–110–M–1 as evidence that the industry was on notice in 1975 that the agency interpreted its regulations to impose an *all* product costs first rule.

On May 1, 1975, the FEA published in the *Federal Register* a proposed "Form FEA P–110–M–1" to replace the forms employed for reporting cost increases to FEA.[149] In the notice, FEA requested written comments on the new form but declined to hold public hearings, asserting that "the proposed Form FEA–P–110–M–1 does not change the substantive requirements of the FEA's price regulations." [150]

The FEA admits that Form P–110–M–1 did not *explicitly* discuss a sequence for recovering increased product and non-product costs. However, the agency now contends that by tracing the cost computations required by the appended schedules, it was evident that proper completion of the form required *all* increased product costs (including allowably banked product costs) to be included in the computation of a refiner's base price for a given product. Such an interpretation would mean that increased non-product costs, which could be recovered only by charging a price in excess of the base price, would have to be recovered *after*

all available increased product costs had been recovered.

The FEA claims that Exxon indicated its understanding that the proper completion of the Form P–110–M–1, at least with respect to gasoline, precluded recovery of increased non-product costs if all increased product costs were not included in the base price of gasoline.[151] Exxon complained that this was inconsistent with its understanding of the intent and purpose of the banking regulations and recommended changes to the form which would have avoided the sequencing requirement.[152] However, the agency admits that a final Form P–110–M–1 was not adopted until April 1976, a juncture at which the FEA had abandoned its *all* product cost first rubric.

The court finds the FEA's reliance on a flimsy *"proposed"* form unpersuasive. The record shows that the FEA did not interpret the form to suggest the same recoupment rule that the agency now asserts had always been in effect.[153] On May 12, 1975, Exxon submitted written comments to the FEA noting that the "form and instructions . . . are inconsistent with the wording or intent of the regulations . . ." and that '[t]he FEA should make the forms consistent with the rules, or else propose new rules and hold a public hearing." [154] Exxon also noted in written comments that the proposed form was,

". . . inconsistent with those portions of the rules which allow a refiner to 'bank' costs and so lower costs to the consumer. Such past actions, taken in the consumers interest and pursuant to the FEA regulations cannot legally be used to disallow recovery of current costs. Further, the FEA should recognize it would be encouraging refiners to maxim-

---

**149.** *See* 40 Fed.Reg. 19120 (May 1, 1975).

**150.** *Id.*

**151.** *See* Attachment W, p. 3, accompanying the defendants' brief in support of their motion for summary judgment filed on September 14, 1977.

**152.** *Id.*

**153.** *See* Gillette's Affidavit, filed on September 14, 1977, pp. 14–16.

**154.** *See* letter dated May 12, 1975 of O. L. Luper, Senior Vice President of Exxon, Attachment L accompanying Gillette's Affidavit filed on September 14, 1977.

ize current prices of all products as opposed to exercising restraint." [155]

Subsequently, in October 1975, a revised proposed Form P–110–M–1 was circulated. After analysis of the revised form Exxon determined that a number of changes had been made consistent with its suggestions and that the revised form only addressed allocation of costs, not sequence of recovery. Gillette Affidavit, ¶ 25. In any event, the proposed Form P–110–M–1 was not adopted during the period in issue. It was not adopted in final form until April 1976, after the ban on banking of non-product costs had been eliminated and after the adoption of a sequence rule that permitted the recovery of increased non-product costs prior to the recovery of banked product costs. As finally adopted, the proposed Form P–110–M–1 was substantially different from the version originally proposed.

The FEA's reliance on a *proposed* form which admittedly did *not* discuss recoupment of costs "*explicitly*," that was modified after the receipt of critical comments, and that was not finally published until after the period at issue in this case is baffling. The court does not find this FEA argument persuasive.

C. *THE FEA's 1975 PROFIT MARGIN REPURIFICATION RULE DID NOT REVEAL THE FEA's INTERPRETATION THAT THE APPLICABLE REFINER PRICE REGULATIONS IMPOSED AN ALL PRODUCT COSTS FIRST SEQUENCE OF RECOVERY RULE.*

On April 23, 1975, FEA published in the Federal Register a notice of a proposed rulemaking in which it considered adopting a procedure whereby a refiner subject to a profit margin limitation could "repurify" itself by returning to the marketplace any increased non-product costs it had recovered during the fiscal year, and thereby not be subject to the profit margin limitation. [156]

This provision was adopted on July 29, 1975,[157] after a public hearing and opportunity to comment. In the preamble to both the proposed and final rules, FEA reiterated that "[i]ncreased product costs are included in base prices, but nonproduct costs are not," and that both the profit margin limitation and repurification rules applied only when a refiner charged prices to recover increased non-product costs in excess of base prices.[158]

The FEA overstates the significance of the 1975 profit margin repurification rule. The preamble merely states that "[i]ncreased product costs are included in base prices, but non-product costs are not." [159] The refiners readily concede that any one of their number who wished to establish a base price above its May 15, 1973 selling price must use only product cost increases. Their contention is simply that *they were not required* to inflate their base price with *all* of their product costs before they were permitted to recover *any* non-product costs from their monthly selling prices. The refiners claim that the regulations permitted them the right to engorge their monthly base price with no product costs, or with some but not all, product costs, while also recovering non-product costs on top of the base price which they set. The profit margin repurification rule does *not* state that *all* product costs had to be recovered before any non-product costs could be recovered, and therefore the repurification rule is irrelevant to the issue currently before the court.

D. *FEA RULING 1975–16, ADDRESSING THE PRICE STRUCTURE OF RESELLERS AND RETAILERS, DID NOT SIGNAL THE IMPOSITION OF AN ALL PRODUCT COSTS FIRST SEQUENCE RULE ON REFINERS.*

On August 29, 1975, FEA issued Ruling 1975–16 which addressed the issue of

**155.** *Id.*

**156.** *See* 40 Fed.Reg. 17859 (April 25, 1975).

**157.** *See* 40 Fed.Reg. 32734 (August 4, 1975).

**158.** *Id.*

**159.** *Id.*

whether *resellers and retailers* were entitled to recover increased non-product costs in those months in which they had been precluded from recovering all of their increased product costs by the operation of the FEA regulation limiting their price increases to once per month.[160] In ruling on this question, FEA explained the sequence in which a maximum allowable price was to be constructed under price regulations applicable to *resellers and retailers*, but inapplicable to refiners. The reseller-retailer regulations called for the construction of a maximum price using: (1) May 15, 1973 selling prices, (2) increased product costs, and (3) increased non-product costs:

"RULING: Pursuant to § 212.93(e), Firm X is permitted to carry forward unrecovered 'increased costs,' as defined in § 212.92 (i. e., unrecovered increased product costs), for recovery in a subsequent month. The regulations do not include a corresponding provision for the carry forward of amounts by which prices charged to do not take full advantage of the authorization in § 212.93(b) to charge prices in excess of those otherwise permitted, to reflect increased nonproduct costs. Section 212.93(b) therefore simply affords a seller a continuing opportunity to recover increased nonproduct costs up to a specified price increment per unit of sales, but does not entail any authority to carry forward for use in determining prices in subsequent months the amount by which prices charged are less than the price increment permitted by that section.

"In order to implement this distinction in treatment between increased product costs and price increments to reflect increased nonproduct costs, prices are regarded as being constituted of three elements, in the sequence in which those elements are set forth in the regulations; i. e., first, the May 15, 1973 price; second, the increased product cost; and, third, increased nonproduct costs. Accordingly, as a general rule, only where a price charged is less than the price based on the first two elements (May 15, 1973 price plus increased product costs), and exclusive of any price increase pursuant to § 212.93(b), which affords the opportunity to pass through increased nonproduct costs, will there be any unrecovered increased product cost available for carry forward under § 212.93(e).[161]

The FEA glibly contends that this statement regarding the application of §§ 212.92 and 212.93 to *resellers and retailers*, is equally applicable and served to notify *refiners*, who were governed by the different §§ 212.82 and 212.83, that the FEA imposed an *all* product costs first sequence rule on such refiners.

This court disagrees with the FEA's assertion. Ruling 1975–16, by its own terms, applies solely to *resellers and retailers.*

The FEA has a well-established technique for alerting firms governed by one subpart of its regulations to the fact that a ruling directed to firms governed by another subpart applies to the former as well. When this is the FEA's intent, the last paragraph

160. *See* 40 Fed.Reg. 40834 (September 4, 1975). The FEA contends that the problem arose because resellers and retailers, unlike refiners, were required to pass through their increased costs in the same month in which they were incurred instead of in the month following the month of the measurement. Thus, increased product costs incurred after a reseller's or retailer's monthly price increase would not be included in that month's recoveries and nonproduct cost increases that had been passed through would have been recovered before all increased products costs had been passed through. *See* 10 C.F.R. § 212.93(a). But the last paragraph of the ruling appears to contradict the Government's assertion that the problem there addressed arose because resellers and retailers "were required to pass through their increased costs in the same month in which they were incurred." *See* Defendants' Brief filed on September 14, 1977 at 44 n. 34. The last sentence of the ruling (40 Fed.Reg. 40834) states:

"It should be noted . . . ., however, that there is no requirement that increased nonproduct costs be passed through pursuant to § 212.93(b) in the same month they are incurred."

161. *Id.*

of the ruling so indicates.[162] No such indication appears anywhere in Ruling 1975–16.[163]

At the time Ruling 1975–16 was issued the Assistant Administrator, for Regulatory Programs, G. C. Smith, did not consider it applicable to refiners. Mr. Smith read the ruling shortly before it was issued on September 4 because it involved important compliance issues concerning resellers and retailers.[164] Smith Dep. at 510–11. A few days later, Mr. Smith authorized Amoco to amend its reports for March of 1975 to reflect proportional recoupment of costs.[165]

The court concludes that Ruling 1975–16 did not serve to place *refiners* on notice that they were subject to an all product costs first rule for sequencing the pass-through of increased costs into the prices paid by those who purchase from refiners.

E. *THE 1974 FEA PRE–NOTIFICA-TION ORDER AND THE FEA's DECISION IN THE GULF AP-PEAL DO NOT ESTABLISH A FIXED ALL PRODUCT COSTS FIRST SEQUENCE OF RECOV-ERY RULE.*

The FEA notes that during the first half of 1974, it received several pre-notification requests by refiners seeking to pass through non-product costs, which requests the agency usually granted.[166] During the summer and fall of 1974, many refiners did not recover all of their increased product costs each month and therefore their product cost banks rapidly grew.

The FEA stresses that the decisions and orders it issued in the second half of 1974 approving pre-notified non-product cost increases included a provision which, according to the agency, stated that non-product cost increases could not be passed through at all if the selling price for a covered product were less than the refiner's base price and that such pre-notified non-product costs could not be included in the formula in § 212.83 for computing the amount of increased product costs that a refiner could add to its May 15, 1973 selling prices to arrive at its base prices.[167] The provision on which the FEA relies consisted of routinely inserted boiler plate language which appeared in many, but not all FEA approvals of pre-notified non-product costs increases in the second half of 1974.

"No part of the increase above base prices of covered products authorized by this Order may be applied to the price of a covered product below the base price. In applying any permitted increase above a base price, no part of the increment so applied may be used to support a calculation permitted or required by § 212.-83."[168]

This court does not agree that the boiler plate inserts into the FEA's 1974 non-product cost pre-notification orders announces an *all* product costs first interpretation of the applicable refiner price regulations.

*First*, these pre-notification orders, were *not* published in the Federal Register.[169] *Second*, the language relied on by the FEA

---

162. *See* Rulings 1974–1, 2, 17, 18, 1975–4. These rulings appear respectively at 39 Fed. Reg. 3910 (Jan. 30, 1974); 39 Fed.Reg. 3911 (Jan. 30, 1974); 39 Fed.Reg. 21043 (June 18, 1974); *Id.*; 40 Fed.Reg. 19635 (May 6, 1975).

163. *See* 40 Fed.Reg. 40834 (September 14, 1975).

164. *See* Smith Dep. 510–511.

165. *See* Amoco's Exhibit 4, Vol. 2 of Smith's Deposition. *See also* Smith Dep. 20–21, 250–260, 275.

166. *See* Musico's Affidavit, ¶ 6, filed on September 14, 1977.

167. *Compare Id.*, at ¶ 7.

168. *Id.*, ¶¶ 6–8.

169. Other language in the pre-notification orders is inconsistent with FEA's present base price interpretation. For example, provisions in the Gulf Order dated October 18, 1974 (¶ 1, p. 2) (attached to the Affidavit of L. G. Armel) and the Sohio Order dated August 5, 1974 (¶ 1, p. 1) (attached as Exhibit C to the Affidavit of Donald O. Maxwell previously filed with Plaintiffs' Brief) indicate that an "increase in base prices of a covered product" would result from application of the pre-notified costs to prices charged. Pre-notified costs were *added* to base prices—they were not part of them.

merely stated that non-product costs should be used to establish a selling price in excess of base price. *Third,* the language relied on by the FEA was haphazardly included in some orders *but not others.* For example, Sohio never received a pre-notification order containing such a proviso, and orders were issued to Northwest Pipe Line and Union Texas Petro on the same day, one with the proviso and one without.[170] *Fourth,* if *as the agency now asserts,* the proviso was intended to impose a sequence of recoupment, the language used was woefully inadequate to accomplish the purpose. *Fifth,* the record currently before this court demonstrates that some refiners were expressly permitted to pre-notify and pass through at least some non-product costs before having fully exhausted all of their product costs, banked and unbanked.[171]

The FEA relies on the decision of its Office of Exceptions and Appeal in *Gulf Oil Corporation,* 2 FEA, ¶ 80,552, CCH Federal Energy Management (March 21, 1975) as an example of agency construction of the 1974 regulations and the boiler plate language in the pre-notification orders, which imposed an *all* product costs first sequence rule upon the period January 1, 1975 through January 31, 1976. FEA's reliance on the *Gulf* ruling is misplaced. That decision was *explicitly* restricted to the application of the regulations *"prior to their revision,"* [172] *i. e.,* prior to the time frame January 1, 1975 through January 31, 1976. The regulatory system

which the *Gulf Oil* ruling addressed did *not* include § 212.83(d),[173] which was added to the FEA's regulatory system on December 5, 1974. The FEA itself admits that § 212.83(d) caused the confusion regarding whether the applicable regulations required a *proportional* approach to the sequence of recovery during the time frame currently under this court's scrutiny, *i. e.,* January 1, 1975 through January 31, 1976.[174] The *Gulf Oil* ruling shed no light on the appropriate construction of the regulations governing the period *January 1, 1975 through January 31, 1976,* which incorporated the crucial and confusing provisions of § 212.83(d), because the *explicit* scope of that ruling was confined to the *1974* regulatory structure, which did not embody § 212.83(d).[175]

Therefore, the court concludes that the 1974 pre-notification orders and the *Gulf* appeal do not establish that the January 1, 1975 through January 31, 1976 refiner price regulations embodied an all product cost first sequence rule.

## F. THE REFINERS' INTERPRETATION OF THE PRICE REGULATIONS DOES NOT NULLIFY THE PROHIBITION ON THE BANKING OF NON–PRODUCT COSTS.

The FEA argues that the existence of a sequence rule should have been inferred from a clue provided on November 29, 1974,

---

**170.** *See* Musico's Affidavit, ¶ 6, filed on September 14, 1977.

**171.** *See* FEA Ruling 1974–12; 39 Fed.Reg. 18423 (May 24, 1974). During 1974 FEA repeatedly allowed Sohio to use non-product cost increases to make upward price adjustments under the pre-notification procedure when Sohio had not passed through *all* of its product cost increases. *See* Maxwell's Affidavit, pp. 2–3, filed on September 14, 1977. Exhibit C attached to that affidavit consists of a formal FEA decision and order granting such a pre-notified non-product cost passthrough.

Assistant Administrator Smith did not know whether the FEA checked to determine whether a refiner's product cost bank had been exhausted before permitting recovery of non-product cost increases. Smith Dep. 513.

Wilson knew of no provision in the regulations requiring exhaustion of product cost

banks as a condition to implementation of price increases under the pre-notification procedure. Wilson Dep. 121.

**172.** *See Gulf Oil Corporation,* Case No. FEA–0301, 2 FEA (CCH), ¶ 80522, p. 80,668 (March 21, 1975); Attachment O, p. 5, accompanying the Defendants' Brief filed on September 14, 1977.

**173.** *See* 39 Fed.Reg. 42368, 42372 (December 15, 1974); Defendants' Brief filed on September 14, 1977, at pp. 38–39.

**174.** *See* 41 Fed.Reg. 33282, 33283 (August 9, 1976); 41 Fed.Reg. 43953–43954 (October 5, 1976).

**175.** The post-1974 regulations contained no pre-notification rule.

when, without advance announcement and without explanation, the agency made "explicit" a prohibition on the banking of non-product costs. The agency currently urges that the "practical effect of permitting refiners to pass through increased non-product costs before all available increased product costs had been passed through would be to permit non-product costs to be 'banked' or carried forward in violation of § 212.-83(e)[(4)]." [176]

The agency seems to be claiming that a non-product cost last rule [177] was implicit in the ban on banking because only if recovery of non-product cost increases was contingent upon prior exhaustion of all available product cost increases would refiners have lost their right to a passthrough of non-product cost increases when selling prices were below the lawful maximum. The language and history of Section 212.83(e)(4) demonstrate that this contention lacks merit.

The ban on banking provision stated in relevant part:

"Increased non-product costs calculated pursuant to § 212.87 for the month of measurement which are not recouped in the current month (which is the month immediately succeeding the month of measurement) may not be carried forward for use in computing allowable prices in excess of base price in any subsequent month. . . ." [178]

The FEA does not argue that a non-product cost last rule was expressly set forth in that section. Section 212.83(e)(4) merely stated *what a refiner could not do* if it failed to recoup all non-product costs in the current month. It said *nothing about the manner* in which costs were to be recouped.

Before November 29, 1974, the rules did not explicitly require that increased non-product costs be recovered in the current month. The substantive provisions governing the use of pre-notified non-product cost increases in calculating maximum allowable prices were contained in 10 C.F.R. § 212.-82(c)(2)(i) and (ii), 39 Fed.Reg. 1924 (January 15, 1974). [179]

Section 212.82(c)(2)(i) provided a formula whereby a refiner could calculate a cent-per-gallon amount that could be added to base prices of *special products* in calculating maximum allowable prices during the consecutive 12-month period for which cost justification had been proposed through the pre-notification process. The regulations permitted a refiner to calculate a percentage increase in non-product costs, pre-notify this *"rate"* of increase, and then use the rate in recovering increased non-product costs in the forthcoming 12-month period. Although "banking" may not have been precisely the right term to use in connection with recovery of increased non-product costs, there is no question that recovery of non-product costs did not have to match actual cost increases on a month-to-month basis.

For *covered products other than special products,* Section 212.83(c)(2)(ii) provided a different formula. This formula was used to calculate a "pool" of cost increases, expressed in dollars, that could be used in the calculation of maximum allowable prices at any time for any product in the category during the consecutive 12-month period following pre-notification. For those products a refiner could include product cost increases attributable to *all* covered products, including costs attributable to special products, in the calculation of maximum allowable prices. This gave refiners even more flexibility. To the extent they chose not to use the full amount of allowable non-product cost increases for calculating the maximum allowable prices of special products, they could reallocate these non-product cost increases from the "special product" catego-

---

**176.** *See* 41 Fed.Reg. 9199 (February 27, 1976).

**177.** Which is the same as an *all* product costs first rule.

**178.** *See* 10 C.F.R. § 212.83(e)(4); 41 Fed.Reg. 9199.

**179.** Initially these provisions were contained in 6 C.F.R. § 150.344(d)(3)(i), (ii); 38 Fed.Reg. 33577 (December 6, 1973).

ry to the "other than special product" category, where they would augment the 12-month general cost pool.[180]

The regulations in existence in *the prenotification period* afforded greater flexibility in recovering costs than was present after the ban on banking was purportedly promulgated. Certainly, the FEA never suggested in the regulations that refiners would be *penalized* for charging *less* than maximum allowable prices.

The rulemaking record leading to the purported adoption of the anti-banking rule shows that the FEA did not believe that the anti-banking rule would impose a sequence of recovery forcing refiners to absorb non-product cost increases in substantial amounts. Nor should the refiners have understood the FEA to have intended such a result.

On September 6, 1974, the FEA proposed "comprehensive" modifications of the petroleum price rules.[181] Three lines of thought reflected in that proposal erode the FEA's current position.

First, with respect to non-product costs, the FEA stated:

"[F]irms will no longer be required to prenotify price increases based on allowable non-product cost increases calculated pursuant to § 212.82. Instead, firms will be permitted to pass through allowable non-product costs on a dollar-for-dollar basis using a method and form similar to that used to pass through of increased product costs pursuant to § 212.83.

" . . .

"FEA has concluded that a single method of calculating cost pass-through should be adopted. The proposed amendments . . . will permit firms to calculate and pass through increases in product and non-product costs in the same manner,

with the non-product cost pass-through remaining subject to a profit margin limitation." [182]

This statement suggests that the agency was not thinking in terms of imposing substantial new restrictions on non-product cost recovery. Rather, the FEA proposed to narrow the distinctions between recovery of product and non-product costs and simplify the treatment of both. Accordingly, the notice promised that the new provisions would retain the "essential substantive features of the current non-product cost pass-through provisions." [183]

Second, the FEA proposed to amend the regulations prospectively to ensure that the cost of oil used to energize refineries would thereafter be treated as a non-product cost. It said that the purpose of the "clarification" was to insure equitable treatment of all refiners, many of which had treated refinery fuel costs as product costs.[184] The FEA assured the industry that the proposed "changes in procedures with respect to the passthrough of non-product cost increases . . . will permit refiners generally to pass through such increased costs of refinery fuels. . . ." [185] It expressly recognized that refinery fuel was an "important cost item." [186]

The agency's suggestion that the reclassification of refinery fuel was relatively inconsequential is revealing. If the FEA understood the regulations to contain both a prohibition on the banking of non-product costs and an *all product costs* first rule, the agency certainly would have advised the industry that recovery of refinery fuel cost increases—an "important" cost item—was now going to be much more difficult. But it did not. Moreover, when the agency finally adopted a rule that effectuated the reclassification of refinery fuel (in the same Federal Register notice that adopted the

**180.** *See* 10 C.F.R. § 212.83(c)(1)(ii); 39 Fed. Reg. 1955 (January 15, 1974).

**181.** *See* 39 Fed.Reg. 32718 (September 10, 1974).

**182.** *See* 39 Fed.Reg. 32721 (September 10, 1974).

**183.** *Id.*

**184.** *See* 39 Fed.Reg. 32724–32725 (September 10, 1974).

**185.** *Id.,* at 32725.

**186.** *Id.*

anti-banking rule for non-product costs) it said that the only impact would be that refinery fuel "will be subject to the profit margin limitation on the passthrough of non-product costs." [187]

The FEA's silence regarding any new difficulty in recovering refinery fuel costs caused by the promulgation of the 1974 anti-banking rule [188] is compelling evidence that the FEA did not consider that recovery of such a cost item would be affected by an unarticulated all product costs first sequence rule. That silence is all the more remarkable when contrasted with what the agency *did* say about limiting the categories of non-product costs that could be passed through on a dollar-for-dollar basis.

In conjunction with its proposal to eliminate the pre-notification requirement, the FEA proposed to "limit the [categories of] increased non-product costs which a refiner may pass through in price increases to refinery labor costs, refinery fuel costs, non-petroleum additive costs, and marketing costs. . . ." [189] Recognizing that this proposal, if adopted, would cause refiners to absorb some of their costs, the agency took great pains to explain and justify the change. Its argument rested primarily on the need for administrative simplicity. It said that computation and monitoring of non-product cost increases would be made much easier, and it sought to assure the industry that the financial impact would be minimal:

" . . . [T]he omitted costs have *little overall impact* on the actual selling price of petroleum products, . . .. The cost increases attributable to costs which are not defined in the proposed regulations as those which may be passed through are estimated to constitute 10 percent or less of the overall cost increas-

es that have been incurred by refiners." (emphasis added) [190]

The FEA also stated that if the proposal prevented refiners from passing through "any significant cost item," it would "consider amending the regulations." [191]

The September and November notices clearly reveal the FEA's perception of the central policy questions involving banking, and those perceptions had nothing to do with sequence of recovery.

In the September 6, 1974 notice of proposed rulemaking, the FEA indicated concern over the size of banks that refiners had already accumulated.[192] Recognizing that supplies were increasing, the FEA concluded that banks would continue to grow, and it proposed a variety of restrictions on further bank accumulation and maintenance. The policy question troubling the agency was set forth unambiguously. The FEA feared that the law of supply and demand might produce sharp price increases in the event of another shortage, and such increases could be effected by drawing on these extensive banks. The agency did note, however, that there was little chance that this would occur, and it acknowledged the beneficial effect that the banking provision had already had:

" . . . [T]he proposed limitations reflect FEA's awareness that *banked costs have already been accumulated* in part *in reliance on FEA regulations and* in part *because of efforts to keep prices down.*" (emphasis added) [193]

On November 1, 1974, the FEA issued its resolution of the banking issue.[194] In place of the virtual elimination of banks originally proposed in September, the November 1 amendment prescribed a "10 percent limita-

187. *See* 39 Fed.Reg. 42369 (December 5, 1974).

188. Which precluded the banking of non-product costs.

189. *See* 39 Fed.Reg. 32721–32722 (September 10, 1974).

190. *See* 39 Fed.Reg. 32722 (September 10, 1974).

191. *Id.*

192. *See* 39 Fed.Reg. 32718, 32722–32723 (September 10, 1974).

193. *Id.*

194. *See* 39 Fed.Reg. 39259 (November 6, 1974).

tion" on the amount of banked costs that could be used to increase prices in a given month.[195] The FEA acknowledged that elimination of product cost "banks" might have had an inflationary impact because it would have given refiners "an incentive to recover the maximum amount of product costs as soon as possible;" elimination of banking would therefore have been "impracticable." [196]

The FEA now urges this court to conclude that one month after assuring the industry that it appreciated the central importance of product cost banking, the agency gave the industry a subtle clue that should have led businessmen to recognize the existence of a sequence of recovery rule that would substantially diminish the anti-inflationary benefits of product cost banking. The agency's position is all the more surprising since FEA officials acknowledge that it was inserted in the Federal Register at the last moment; that its potential economic consequences had not been studied; and that its relationship to sequence of recovery had not been considered at all.[197]

The agency acknowledged in April of 1976, that the anti-banking rule, combined with the all product costs first recovery rule, gives refiners an incentive to accelerate recovery of all available cost increases in order to avoid having to absorb non-product cost increases.[198] The practical effect of the agency's current construction of Section 212.83(e)(4) would have been to encourage refiners to forego the banking of product cost increases, until they recovered all increased costs currently so as not to be forced to absorb any cost increases. In other words, the agency's current construc-

tion renders the provision for banking of increased *product* costs ineffective. Absent any guidance in the preamble as to what this new anti-banking rule was supposed to accomplish, refiners had no reason to suspect that it had a purpose other than that disclosed on its face. The section merely said refiners could not bank increased non-product costs that were not recouped during the current month. It told refiners that they would "lose" the opportunity to recover some of their increased costs if they did not "use" their increased non-product costs in the current month. It said nothing about how they were to be used.

The court concludes that the prohibition on banking non-product costs did not signal to refiners that the FEA's applicable price regulations embodied a *sub silentio all* product costs first sequence rule.

G. *THE COURT FINDS THAT THE FEA FIRST MAINTAINED AN ALL PRODUCT COSTS FIRST SEQUENCE RULE ON FEBRUARY 1, 1976, WHEN IT FIRST EXPLICITLY STATED SUCH AN INTERPRETATION REGARDING REFINER PRICING TECHNIQUES DURING THE JANUARY 1, 1975 THROUGH JANUARY 31, 1976 TIME FRAME.*

The FEA failed to demonstrate that it either explicitly or implicitly announced an all product costs first interpretation of the applicable regulations during the time frame under examination.[199] In sharp contrast with the FEA's arguments, the record before this court is replete with examples of FEA officials interpreting the applicable

---

**195.** *See* 39 Fed.Reg. 39260 (November 6, 1974).

**196.** *See* 39 Fed.Reg. 39259. In the statutory findings that the FEA included as part of its February 4, 1976 rulemaking, the agency expressly noted that its November 1974 findings had been correct and it explained in great detail and with elaborate illustrations, that product cost banking is vital to the viability of the refining industry. 41 Fed.Reg. 5111, 5121, *et seq.* (Feb. 4, 1976).

**197.** *See* Part II(C), (D) of this Memorandum of Opinion, *supra.*

**198.** *See* 41 Fed.Reg. 15330 (April 12, 1976).

**199.** *See* Part III(A)–(F) of this Memorandum of Opinion, *supra.*

regulations in a fashion that is both inconsistent with the agency's current view of the 1975 regulations and consistent with the interpretation of at least some of the plaintiffs.[200] FEA officials uttered such interpretations during the crucial January 1, 1975 through January 31, 1978 time frame,[201] and after that period.[202] Furthermore, the language comprising the applicable regulations, pertaining to the calculation of a maximum lawful price explicitly vested refiners with discretion to peg a base price at whatever level the refiner selected, because Section 212.83(c)(1)(i), (ii) employed the permissive language *"may"* when it stated: "In computing . . . base prices . . . a refiner *may* increase its May 15, 1973 selling prices. . . ." (emphasis added).[203] Neither the regulation allowing the banking of product costs, nor the regulations prohibiting the banking of non-product costs explicitly curtailed the refiners' discretion to establish a base price,[204] and the court is not persuaded that such provisions implicitly pruned that discretion. The propriety of an *all* product cost first rule was further undermined by the admittedly confusing language of Section 212.83(d), the language of which supports a proportional passthrough rule.[205] Therefore the court concludes the refiners established that the FEA never maintained an all product costs first sequence rule until February 1, 1976 when the agency first issued such an explicit interpretation.[206]

## IV.

### THE FEA REFINER PRICE REGULATIONS GOVERNING THE TIME FRAME JANUARY 1, 1975 THROUGH JANUARY 31, 1976 MAY NOT BE RETROACTIVELY CONSTRUED TO EMBODY AN ALL PRODUCT COST FIRST RULE WHICH WAS NEVER INCLUDED IN THOSE REGULATIONS DURING THE APPLICABLE PERIOD.

The court has concluded, as a matter of law, that the FEA's refiner price regulations never embodied an *all product costs first* sequence of increased cost recovery rule until February 1, 1976,[207] when the agency, for the first time, explicitly stated such an interpretation and purported to retroactively apply that interpretation to the January 1, 1975 through January 31, 1976 time frame. This court rejects the rationale that such a retroactive interpretation is valid in the context of this case. In *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977 (2nd Cir. 1951) the government argued that an omission in the regulations under consideration was "unintended;" that the public hearings preceding issuance of the regulations showed what they were actually intended to cover; and that the courts should not construe the regulations too literally, "recognizing the administrative purpose. . . ."[208] Thus the government sought to persuade the *Tobin* court to cure an admitted defect in the applicable regula-

---

**200.** The FEA argues, based on the survey data released in 41 Fed.Reg. 40559, 40560 (September 20, 1976) that 46 refining firms adopted the regulatory interpretation which the agency now espouses. However, the data, as reported does not compel such a conclusion. The survey data shows only that the 46 firms *either* applied the FEA's interpretation, *or* had no non-product cost increases to pass through. Thus the survey report does not exclude the possibility that all 46 firms which achieved the result which the agency now contends is correct, did so because they had no non-product costs to pass through, rather than out of a common interpretation of the regulations. The agency has not dispelled the ambiguity in the Federal Register Report by supplementing the record in this case with additional data.

**201.** *See* Part II(D), *supra* of this Memorandum of Opinion.

**202.** *See* Part II(E), *supra* of this Memorandum of Opinion.

**203.** *See* 39 Fed.Reg. 1955 (January 15, 1974).

**204.** *See* 39 Fed.Reg. 42368 (December 5, 1974).

**205.** *See* text accompanying footnotes 173–175.

**206.** *See* 41 Fed.Reg. 5111 (February 4, 1976).

**207.** *See* Part III, *supra* of this Memorandum of Opinion. *See also,* 41 Fed.Reg. 5111, 5113 (February 4, 1976).

**208.** *See* 187 F.2d, at 979.

tions through judicial interpretation, and then retroactively apply the glossed regulation to the detriment of a regulated party then before the court. The Second Circuit, in an opinion delivered by Judge Jerome Frank, rejected the government's argument holding:

"Were we interpreting a statute to ascertain what power it conferred on an administrative officer, much could be said for such an argument. Beginning at least with Aristotle, it has often been recognized that, as a legislature cannot foresee all possible particular instances to which legislation is to apply, it must therefore be reasonably so interpreted to fill in gaps. [Footnote omitted.] But when the legislature delegates to an administrative official the authority, by 'sublegislation', to issue regulations, in order to fill in those gaps, then the regulations, precisely because they particularize, ought not be as generously interpreted as the statute. In fairness to the regulated, the provisions of the regulations should not be deemed to include what the administrator, exercising his delegated power, might have covered but did not cover. True, in deciding what they do cover, we must not regard their literal terms merely, but must also give much weight to administrative interpretative rulings which have been published and of which the regulated are thus on notice. But here there are no published rulings giving the construction for which the [Government] contends." [209]

In *United States v. Chicago Blackhawk Hockey Team Inc.*, 468 F.2d 221 (TECA, 1972) the temporary emergency court of appeals adopted a similar approach to that of the *Tobin* court. In *Chicago Blackhawk* the relevant CLC price regulations prohibited persons from charging prices for programs that exceeded those charged in the base period, July 16, 1971, through August

14, 1971. The Blackhawks played no games in this period and hence had no base period transactions. As explicitly required by the regulations, they looked to the closest prior 30-day period. This put them into a month during which they had participated in the previous season's Stanley Cup play-off games. They concluded that the prices they had charged for programs during the play-offs established their base period prices for the 1971–72 regular season.

The CLC sought to prevent the Blackhawks from charging prices any higher than those charged during the prior regular season, and the district court granted the Council's request for a permanent injunction.

TECA reversed. It could well have agreed with the CLC that it simply made no sense to permit the team to use the express terms of the base price rules to charge a higher price for regular season programs than it had the year before. Instead the court refused to *de novo* gloss the plain meaning of the regulations and retroactively apply the novel interpretation to the detriment of a regulated party when the agency charged with crafting the regulations had never previously signaled its novel interpretation to the regulated industry. Thus the *Chicago Blackhawk* court held that the CLC had an obligation to issue appropriate regulations if it wanted to draw distinctions between programs sold at regular season games and those sold at play-off games.

"We are not here concerned with the power of the Cost of Living Council to adopt a regulation which would create a distinction between the sales of programs and other commodities at home games and at play-off games, but rather with the issue of whether the regulation adopted under the facts before us permits

---

209. *See* 187 F.2d, at 979–980. *Compare* cases cited in 187 F.2d, at fn. 6. The temporary emergency court of appeals has recognized the imperative need for clear administrative regulations which may involve criminal sanctions. *See Longview Refining Co. v. Shore*, 554 F.2d 1006, fn. 20 (TECA 1977). In accord *see M.*

*Kraus and Bros v. United States*, 327 U.S. 614, 707 (1946); *United States v. Pincourt*, 167 F.2d 831, 833 (3rd Cir. 1948); *Schild v. Busch*, 293 F.Supp. 1353, 1354–1356 (S.D.Texas, 1968), all of which involved penalties imposed under price control regulations comparable to the regulations involved in this case.

the consideration of the prices charged for programs at play-off games to establish base freeze prices." [210]

The *Tobin* and *Chicago Blackhawk* cases hold that a federal court will not retroactively apply an unforeseeable interpretation of an administrative regulation to the detriment of a regulated party on the theory that the *post hoc* interpretation asserted by the agency is generally consistent with the policies underlying the agency's regulatory program, when the semantic meaning of the regulations, as previously drafted and construed by the appropriate agency, does not support the interpretation which that agency urges upon the court. In *Sampson v. Clark*, 162 F.2d 730 (Em.Ct.App.1947), the United States Emergency Court of Appeals applied this fundamental principle to facts remarkably similar to those presented here.

*Sampson* involved price regulations of the Office of Price Administration ("OPA") requiring a garment manufacturer's maximum prices to be based on "wage rates paid by you" [211] on March 31, 1942. Since Sampson was a "new manufacturer" who had not been in the garment business on that date, he had to obtain OPA approval before selling or delivering any garments. Such authorization was granted in 1943 and 1944, but the OPA's orders did not explicitly state how base period labor costs should be calculated. The regulations were also silent on that question until 1946. [212]

Sampson adopted a cost calculation method that the OPA Administrator ultimately challenged in an enforcement proceeding initiated in 1945. Thereafter, on Sampson's request for an interpretation, the OPA Administrator declared that a new manufacturer should calculate base period labor costs by using wage rates paid on March 31, 1942 by the garment industry in the new manufacturer's area. This "interpretation"

was quickly followed by "Amendment No. 6," which stated:

". . . the phrase, 'wage rates paid by you' shall be interpreted to mean 'wage rates paid on March 31, 1942 by manufacturers [sic] of the same category of garments in the same area.' " [213]

Sampson then filed a protest, contending that the regulations and the OPA orders had been silent on the issue and there had been no contemporaneous constructions of regulations. The protest was referred to an OPA Board of Review for an advisory opinion.

The Board turned down the protest, suggesting that the "structure of the regulations" should have given Sampson a "rather direct clue" as to what was required. [214] The administrator agreed with the Board, whereupon Sampson brought suit.

The OPA admitted, in the proceeding before the Emergency Court, that prior to the 1946 amendment the regulations had suffered from "some indefiniteness as to the method of determinating wage rates." [215] Thus the OPA conceded that the pre-1946 regulations did not explicitly delineate a method of calculating a new manufacturer's labor costs, just as the FEA has conceded that its pre-1976 regulations did not explicitly state the method of recovering cost increases. [216] Also, the OPA Board of Review urged that direct labor costs paid by Sampson's competitors "would be a *guide* to the amount of direct labor costs he might safely include in his calculation of maximum prices," [217] just as the FEA argued in this case that the refiner-plaintiffs, acting *without* explicit instruction from the agency, should have understood that regulations purporting to *define maximum lawful price,* furnished guidance on the discrete question of the sequence for *recovering increased costs.*

**210.** *See* 468 F.2d, at 224.

**211.** *See* 162 F.2d, at 732.

**212.** *See* 162 F.2d, at 731–732.

**213.** *See* 162 F.2d, at 735–736.

**214.** See 162 F.2d, at 733.

**215.** See 162 F.2d, at 733.

**216.** *See* 41 Fed.Reg. 33282, 33283 (August 9, 1976).

**217.** See 162 F.2d, at 733 (emphasis added).

The Emergency Court found for Sampson. Addressing the OPA's 1946 interpretation, an interpretation directly analogous to that announced in the preamble to the cost recovery rule first adopted by the FEA in February of 1976,[218] the *Sampson* court held:

> "This interpretation did not clarify, but instead changed the meaning of the Regulation as it existed at the time this controversy arose. It is in effect an amendment rather than an interpretation, and is not effective to show the meaning of the Regulation as originally written.

> "As to Amendment 6, it would not, in any event, operate retroactively. *Van Der Loo v. Porter,* 1946, 160 F.2d 110, 113.

> . . .

> "In conclusion, it is true, as emphasized by the Administrator, that the Regulation was designed to 'freeze' the pattern of prices and wages prevailing in the industry during the base period of March 1942, and that the regulatory scheme was clearly intended to include manufacturers, such as complainant, who had entered the business subsequent to that period. Assuming that the action of the Administrator in his interpretations and orders was inspired by the legitimate purposes mentioned, it does not follow that his determinations in this regard were justified by the Regulation. It is our conclusion that the Regulation did not provide complainant the required standard whereby he could compute and determine his wage rates, direct labor cost, and maximum prices; and this is the controlling issue in the case."[219]

Similarly, this court determined that regardless of the FEA's intent, its regulations never communicated an *all product* cost first sequence of increased cost recovery rule to refiners during the January 1, 1975 through January 31, 1976 time frame, and this court will not cure that defect by parroting the strained *post hoc* "interpretation" which the agency expressed for the first time on February 1, 1976.[220] The court holds that the FEA's all product costs first sequence of recovery rule, first articulated in the preamble to the February 1, 1976 rulemaking, invalid and unenforceable against the plaintiff-refiners[221] because the agency's regulations simply did not state the *all product costs first* rule espoused in that preamble.

## V.

### THE FEA's ALL PRODUCT COST FIRST SEQUENCE RULE AND THE EXPLICIT PROHIBITION ON BANKING NON–PRODUCT COSTS ARE INVALID BECAUSE THEY WERE NOT PROMULGATED IN COMPLIANCE WITH THE APPLICABLE RULEMAKING REQUIREMENTS.

Section 4(b)(3) of the Administrative Procedure Act requires agencies in rulemaking to publish "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Section 4(c) requires agencies to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views or arguments . . . ." 5 U.S.C. § 553(c). That section also requires agencies to publish "a concise general statement of the basis and purpose"

---

**218.** See 41 Fed.Reg. 5111, 5113 (February 4, 1976).

**219.** *See* 162 F.2d, at 736. *Compare Diamond Roofing Company v. Occupational Safety and Health Review Commission,* 528 F.2d 645 (5th Cir. 1976) where the court, faced with a regulatory interpretation question akin to the issues presented in this case, held:

> "Like other statutes and regulations which allow monetary penalties against those who violate them, an occupational safety and health standard must give an employer fair

warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *See* 528 F.2d, at 650.

**220.** *See* 41 Fed.Reg. 5111, 5113 (February 4, 1976).

**221.** This holding obviously applies only to actions taken by the plaintiff-refiners between January 1, 1975 through January 31, 1976.

for a proposed rule.[222] The Temporary Emergency Court of Appeals has held that these provisions are fully applicable to FEA's predecessor agencies. *Shell Oil Company v. FEA,* 527 F.2d 1243, 1247 (TECA 1975); *Tasty Baking Co. v. Cost of Living Council,* 529 F.2d 1005, 1014 (TECA 1975).[223]

**222.** Section 4(b), (c) of the Administrative Procedure Act, 5 U.S.C. § 553(b), (c), pertinently provides:

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

"(1) a statement of the time, place, and nature of public rule making proceedings;

"(2) reference to the legal authority under which the rule is proposed; and

"(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

"(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection."

**223.** *See also* 15 U.S.C. § 766(i)(1)(A) which imposes the strictures of the APA on the FEA's rulemaking endeavors.

**224.** *See* 15 U.S.C. § 761 *et seq.* The Temporary Emergency Court of Appeals' recent decision in *National Helium Corp. v. FEA,* 569 F.2d 1137, (TECA 1977) may signal that court's relaxation of the strict enforcement of the *APA's* prior notice requirements. *See National Helium,* 569 F.2d, at 1146. However, *National Helium* embodies two crucial features which distinguish it from this case. *First,* in *National Helium* the FEA endeavored to justify the absence of prior

The Federal Energy Administration Act imposed an even more rigorous rulemaking procedure on the FEA.[224] In addition to requiring notice of "the subjects and issues involved," [225] Section 7(i)(1)(B) of the FEAA requires that "[n]otice of any proposed rule or regulation . . . shall be given by *publication* of the rule [or] regulation." [226] Furthermore, Section 7(i)(1)(C) [227] requires

notice and opportunity for public comment at the time the challenged regulations were issued. *See National Helium* at 1146. *Second,* the regulations challenged in *National Helium* were promulgated on April 5, 1974 over a *month prior to the effective date of the FEAA, which imposes a prior publication requirement and other supplemental procedural requirements beyond those imposed by the APA alone.* See 15 U.S.C. § 766(i)(1)(B), (C). *See also* the discussion of the FEAA's legislative history in *Shell Oil v. FEA,* 440 F.Supp. 876, 882 (D.Del., 1977). Thus the *National Helium* decision does not consider the uniquely demanding procedural requirements of the FEAA, which are fully *applicable to this case.*

**225.** 5 U.S.C. § 553(b), (e); 15 U.S.C. § 766(i)(1)(A).

**226.** *See* 15 U.S.C. § 766(i)(1)(B) which pertinently states:

"(B) Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulations, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order."

**227.** *See* 15 U.S.C. § 766(i)(1)(C) which pertinently provides:

"(C) In addition to the requirements of paragraph (B), if any rule, regulation, or order described in paragraph (A) is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded. To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of such rule, regulation, or order, but in all cases such opportunity shall be afforded no later than forty-five days after the issuance of any such rule, regulation, or order. A transcript shall be kept of any oral presentation."

an opportunity for the presentation of oral views prior to the issuance of the rule or not later than 45 days following the issuance of the rule. The procedural provisions of both the APA and the FEAA were fully applicable to the Federal Energy Administration at all times pertinent to this litigation.[228]

In adopting the all product costs first theory of increased cost recovery, the FEA and its predecessor agencies never complied with these procedural requirements. The FEA continues to rely on the masquerade that compliance with these requirements was not necessary because it never changed the implicit requirements of the regulations. Yet, this court has found that nowhere prior to the February 1, 1976 rulemaking did the agency ever give notice that it required an all product cost first sequence for the recoupment of increased product and non-product costs. The agency did not furnish advance notice of the subject matter or the issues presented by such a rule. The agency did not furnish advance notice of the rule itself, or provide the public with the required opportunity for the presentation of written comments. Nowhere did the FEA furnish the public the required opportunity for oral comment, despite the rule's enormous impact, and nowhere did the agency publish a statement of basis and purpose for such a rule.

In *Shell Oil Company v. FEA,* 527 F.2d 1243, 1247, *supra,* the Temporary Emergency Court of Appeals held that when an agency fails to comply with provisions of the APA, its rulemaking efforts are void *ab initio.* And the District Court in Delaware has reached the same result *when the requirements of the FEAA were disregarded. See also Shell Oil Company v. FEA,* 440 F.Supp. 876 (D.Del., 1977). The recent *Shell Oil* decision in the Delaware District Court is the latest among several decisions holding that agency action taken in disre-

gard of statutory rulemaking procedures is void. *See e. g. Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 37 L.Ed.2d 270 (1974); *Consumers Union of United States, Inc. v. Sawhill,* 393 F.Supp. 639 (D.D.C.), *aff'd per curiam,* 523 F.2d 1404 (TECA 1975); *Joseph v. United States Civil Service Comm'n,* 18 U.S.App.D.C. 281, 294–95, 554 F.2d 1140, 1153–54 (1977); *Rodway v. United States Dept. of Agriculture,* 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975); *United States v. Finley Coal Co.,* 493 F.2d 285, 291 (6th Cir. 1974). As the Temporary Emergency Court of Appeals stated in *California v. Simon,* 504 F.2d 430, 439 (TECA, 1974) "substantial compliance with rulemaking requirements is essential to the validity of administrative rules."

■ On February 1, 1976, without prior notice or opportunity for comment, the FEA published the *all product costs* first rule for the only time.[229] In the preamble to that regulation, the agency asserted that the rule embodied in Section 212.85 could have been found in the regulations all along. The FEA subsequently revoked Section 212.85 retroactive to the date of its issuance.[230] Notwithstanding the retroactive elimination of Section 212.85, however, the agency intends to implement a comparable interpretation for the period prior to February 1976. This the agency may not do without first complying with the procedural requirements of both the APA and the FEAA. This court has found that the all product cost first sequence rule was never articulated or published by the agency prior to February 1, 1976. That rule could not have satisfied the publication requirement of the FEAA,[231] and is therefore invalid for that reason, unless the sequence rule falls within an exemption to the rigorous FEAA advanced disclosure requirements. However the FEAA provides only the narrowest exemption from its publica-

---

**228.** The FEAA became effective on May 7, 1974. *See* 15 U.S.C. § 766.

**229.** *See* 10 C.F.R. § 212.85; 41 Fed.Reg. 5111, 5113 (February 4, 1976).

**230.** *See* 41 Fed.Reg. 15329 (April 12, 1976).

**231.** *See* 15 U.S.C. § 766(i)(1)(B).

tion, notice, and comment requirements. Those provisions "may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule [or] regulation . . ." 15 U.S.C. § 766(i)(1)(B).[232] The FEA made no published or unpublished finding in connection with the issuance of its new sequence interpretation and did not set out any such finding in the preamble.[233] In the absence of such a finding, the procedural provisions of the FEAA apply in full force to invalidate the all product costs first sequence interpretation.[234]

Similarly, the FEA never published a *proposed* prohibition on banking non-product costs, and never furnished advance notice of that explicit regulatory prohibition. The non-product cost anti-banking provision was first published on its effective date, December 5, 1974, and was therefore promulgated in violation of 15 U.S.C. § 766(i)(1)(B) which requires the publication of proposed FEA regulations at least ten days prior to their effective date unless the agency specifically states why it cannot furnish the mandatory advance publication. When the agency published the non-product cost banking prohibition, it did not attempt to excuse its failure to publish that regulation prior to the effective date. Thus, the explicit prohibition on banking non-product costs, 10 C.F.R. § 212.83(e)(4), 39 Fed.Reg. 42372 (December 5, 1974) is void because of the agency's failure to follow the clear procedural requirements for promulgation.

## VI.

### THE FEA's ALL PRODUCT COSTS FIRST INTERPRETATION IS CONSISTENT WITH THE AGENCY'S STATUTORY AUTHORITY UNDER THE EPAA.

The refiner-plaintiffs argue: that under the EPAA[235] they were entitled to a "dollar-for-dollar passthrough" of all cost increases; that the FEA's February 1, 1976[236] *all product cost first* sequence interpretation deprived them of that statutory entitlement; and that such an interpretation therefore exceeds the agency's statutory authority. The short answer to this assertion is that the EPAA extended *no* dollar-for-dollar increased costs passthrough protection to refiners during the January 1, 1975 through January 31, 1976 time frame.

As originally enacted in November 1973, § 4(b)(2)(A) of the EPAA provided that the price regulations "shall provide for;"

"(A) a dollar-for-dollar passthrough of net *increases* in the cost of crude oil, residual fuel oil, and refined petroleum products *to all marketers or distributors at the retail level.*" (emphasis added)[237]

The emphasized language indicates that Section 4(b)(2)(A), as originally enacted in the EPAA, permitted *"marketers"* and *"distributors," not refiners,*[238] to pass through increased costs *"at the retail level."* The refiner-plaintiffs cannot show that Congress explicitly understood the terms "marketers" and "distributors" to embrace refiners. Furthermore, the limitation "at the retail level," suggests that Congress intend-

**232.** See Shell Oil Company v. FEA, 440 F.Supp. 876, 881 (D.Del., 1977).

**233.** See 41 Fed.Reg. 5111 et seq. (February 4, 1976).

**234.** Compare Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858, 863–864 (D.Del., 1970); Saint Francis Memorial Hospital v. Weinberger, 413 F.Supp. 323, 329–331 (N.D.Cal., 1976); Montana Power Company v. EPA, 429 F.Supp. 683 (U.S.D.Ct., Mont., 1977). All three cases involve judicial enforcement of the APA's prior notice and opportunity to comment requirements in settings unrelated to the application of the FEAA. Thus the applicability of those cases may be somewhat blunted by

National Helium Corporation v. FEA, 569 F.2d 1137, 1146, and fn. 18 (TECA, 1977).

**235.** See Pub.L. 93–159; 1973 U.S.Code Congressional and Administrative News, p. 693 et seq.

**236.** See 41 Fed.Reg. 5111, 5113 (February 4, 1976).

**237.** See Pub.L. 93–159, § 4(b)(2)(A); 1973 U.S. Code Congressional and Administrative News, p. 695.

**238.** All plaintiffs in this case are refiners.

ed the dollar-for-dollar passthrough protection *only* for those dealers who formed the last link in the chain of commercial distribution of petroleum products. The first link in that chain is formed by refiners, *i. e.,* those who procure and refine raw petroleum and sell their products to middlemen. The commercial chain of distribution terminates with sale by a merchant to a consumer.[239] It therefore follows that refiners who form the first, not the last, link in that commercial chain were not protected by the EPAA.

This construction of the EPAA is reinforced by the language of the amendment to the EPAA, which removed the *"at the retail level"* limitation on access to the dollar-for-dollar passthrough protection. On December 22, 1975, Section 402 of the Energy Policy and Conservation Act ("EPCA"), Pub.L. 94–163,[240] amended Section 4(b)(2)(A) of the EPAA to provide that the price regulations:

> "(A) shall provide for a dollar-for-dollar passthrough of net *increases* in the cost of crude oil, residual fuel oil, and refined petroleum products *at all levels of distribution from the producer through the retail level.*" (emphasis added)

After December 15, 1975, the statute no longer was directed narrowly at the passthrough of *marketers'* and *distributors'* increased costs *at the retail level,* but was broadened to include the passthrough of all increased raw material costs "at all levels of distribution *from* the *producer through* the retail level." (emphasis added). If the refiners' expansive interpretation of the earlier EPAA was correct, then there would have been little need for Congress to fashion the subsequent EPCA amendment.

Thus the plain meaning of the EPAA rebuffs the plaintiff-refiners construction of the FEA's statutory authority to impose cost absorption on refiners. *Compare Hamilton v. Rathbone,* 175 U.S. 414, 419, 20 S.Ct. 155, 44 L.Ed. 219 (1899); *Firestone Tire and Rubber Company v. Coleman,* 432 F.Supp. 1359, 1362, fn. 2 (N.D.Ohio, 1976).

The court concludes that the *all product costs first* interpretation does not exceed the FEA's statutory authority,[241] and had the agency issued regulations which actually embodied that interpretation,[242] pursuant to the required statutory procedures mandating prior publication, notice, and an opportunity to comment,[243] such an interpretation would have been valid for the time frame January 1, 1975 through January 31, 1976. The FEA's boondoggle in this case was not rooted in the agency's misinterpretation of its statutory authority. Instead, the FEA's colossal "1.3 billion dollar" blunder stems from its own failure to follow *Congressionally* mandated procedures coupled with remarkably inept and self-contradictory regulatory draftsmanship, and administration of the cost recovery sequence issue during the fall of 1974 and all of 1975.

## VII.

## CONCLUSION

The court holds that FEA never issued a valid *all product costs first* passthrough rule applicable to the time frame January 1, 1975 through January 31, 1976, and the court orders the issuance of a declaratory judgment to that effect, thereby granting the refiner-plaintiffs' motion for summary judgment on that issue and denying the

---

**239.** By "consumer" is meant a person who purchases petroleum products for her or his own use, and not for resale to another.

**240.** *See* Pub.L. 94–163; 1975 U.S.Code Congressional and Administrative News, 89 Stat. 946. *See also Standard Oil I,* 440 F.Supp. 329, 335 fn. 28 (N.D.Ohio, 1977).

**241.** Of course, this refers only to the FEA's statutory authority during January 1, 1975 through January 31, 1976.

**242.** This court has held that the applicable regulations did not explicitly or implicitly articulate an *all product costs first sequence* rule. *See* this Memorandum of Opinion, *supra,* at Parts III and IV.

**243.** This court has held that the FEA did not adhere to the required statutory procedures for promulgating an *all product cost first sequence* rule and for promulgating the prohibition on banking non-product costs. *See* this Memorandum of Opinion, *supra,* Part V.

defendants' motion for summary judgment on that issue.

The court holds that the FEA never issued an *all product costs first* sequence rule governing the period January 1, 1975 through January 31, 1976 in compliance with the required rulemaking procedures and therefore any such rule is void. Likewise, the court holds that the FEA did not issue the explicit rule banning the banking of non-product costs in compliance with the required rulemaking procedures and therefore 10 C.F.R. § 212.83(e)(4); 39 Fed.Reg. 42372 (December 4, 1977) is void. The court orders the issuance of a declaratory judgment to that effect, thereby granting the refiner-plaintiffs' motion for summary judgment on those issues and denying the defendants' motion for summary judgment on those issues.[244]

The court holds that the *all product costs first* sequence rule is within the FEA's authority under the EPAA and therefore such an interpretation, applicable to the period January 1, 1975 through January 31, 1976, does not exceed the FEA's statutory authority. The court orders issuance of a declaratory judgment to that effect, thereby granting the defendants' motion for summary judgment on that issue and denying the refiner-plaintiffs' motion for summary judgment on that issue.

The court permanently enjoins the FEA, its employees and successor agencies from enforcing any *all product costs first* sequence rule, as stated in the preamble to 41 Fed.Reg. 5111 (February 4, 1976), against any of the refiners who are plaintiffs to this action based on the plaintiffs' conduct during January 1, 1975 through January 31, 1976. Likewise, the court permanently enjoins the FEA from enforcing the explicit ban on banking non-product costs stated in 10 C.F.R. § 212.83(e)(4); 39 Fed.Reg. 42372

(December 5, 1974) against any of the refiner-plaintiffs in this action. *See* 12 U.S.C. § 1904, *Note* § 211(d) and *Standard Oil I,* 440 F.Supp. 329, 332 fn. 9 (N.D.Ohio, 1977).

The court finds that the constitutional questions raised by the refiner-plaintiffs' complaints are substantial and therefore certifies those issues to the Temporary Emergency Court of Appeals pursuant to 12 U.S.C. § 1904, *Note* § 211(c). *See also Standard Oil I,* 440 F.Supp. 329, 332 fn. 9 (N.D.Ohio, 1977).

The court will retain jurisdiction over the "Second Claim" in Texaco's complaint, Case No. C77–11 dealing with the Freedom of Information Act, 5 U.S.C. § 552. That issue shall remain pending before this court. However, the court finds that its opinion today involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from today's order will materially advance the ultimate termination of the litigation involving Texaco, as well as all the other parties to these consolidated cases. Thus the court certifies Texaco's case, as well as all the other refiners' cases, under 28 U.S.C. § 1292(b), and 12 U.S.C. § 1904, *Note* § 211(d)(2), Fed.R.Civ.P. 54(b), for an interlocutory appeal to the Temporary Emergency Court of Appeals. *See also Standard Oil I,* 440 F.Supp. 329, 332 fn. 9 (N.D.Ohio, 1977).

The court also orders that the Department of Energy ("DOE") be substituted for the FEA in the caption and text of the final judgment.[245]

IT IS SO ORDERED.

244. Thus the court holds that the FEA's *all product costs first* sequence rule and its ban on banking non-product costs violate 5 U.S.C. § 706 because of procedural defects in their promulgation.

245. Under the Department of Energy Organization Act, Pub.L. 95–91, the Department of En-

ergy became the successor in interest to the FEA on October 1, 1977. *See* Executive Order No. 12009; 42 Fed.Reg. 46267 (September 15, 1977). Therefore it is appropriate for the court to substitute DOE for the FEA in the final judgment. *See* Pub.L. 95–91, §§ 301(a), 705(d), (e) and Fed.R.Civ.P. 25.